785 S.E.2d 613

**NICHOLS HOLDING, LLC and J. Wade Nichols, Respondents–Appellants,**

v.

**DIVINE CAPITAL GROUP, LLC, John S. Divine, IV, Nathan Anderson, and Divine Dining Group, Inc., Appellants–Respondents.**

Appellate Case No. 2014–000662.

No. 5397.

Court of Appeals of South Carolina.

Submitted Dec. 29, 2015.

Decided March 30, 2016.

Rehearing Denied June 2, 2016.

328

Emma Ruth Brittain, Leah Montgomery Cromer, and J. Jackson Thomas, of Thomas & Brittain, P.A., of Myrtle Beach, for Appellants–Respondents.

Gene M. Connell Jr., of Kelaher, Connell & Connor, P.C., of Surfside Beach, for Respondents–Appellants.

GEATHERS, J.

In this breach of contract action, Appellants–Respondents, Divine Capital Group, LLC, John S. Divine, IV, Nathan

Anderson, and Divine Dining Group, Inc. (collectively, Divine), and Respondents–Appellants, Nichols Holding, LLC and J. Wade Nichols (collectively, Nichols), seek review of the circuit court's order. Divine appeals that part of the order requiring Divine to pay impact fees to Georgetown County Water and Sewer District (the District) on behalf of Nichols. Nichols challenges that part of the order requiring Nichols to pay Divine's outstanding trade debt.[1]

## FACTS/PROCEDURAL HISTORY

In March 2011, Nichols filed this breach of contract action against Divine to recover capital contributions made to Divine for the purpose of opening certain restaurants at The Market Commons in Myrtle Beach. Nichols also sought an accounting and the appointment of a receiver to run all of Divine's restaurant businesses. At the time, two related actions involving the parties were pending in circuit court.[2] On May 25, 2012, the circuit court ordered the establishment of a receivership over Divine's restaurant businesses and appointed Arlene Jaskot, CPA, as the receiver.

Meanwhile, the District sent yearly notices to Divine concerning the District's imposition of a "Demand Charge," in addition to regular water and sewer charges, on the accounts of two restaurants located on Parsonage Creek in Murrells Inlet, i.e., Bovine's Wood Fired Specialties (Bovine's) and Divine Fish House (collectively, the Restaurants). At least one of these notices was signed by the District's "Finance/Administration Director," John F. Buck.[3] The notices stated, in pertinent part:

---

1. We decide this case without oral argument pursuant to Rule 215, SCACR.

2. One of the actions, *Bank of North Carolina v. Abaco Holdings, LLC, et al.*, No. 2010–CP–22–1541, was a mortgage foreclosure action. The other action, *J. Wade Nichols and J. Wade Nichols DMD, P.A. Profit Sharing Plan v. John S. Divine, IV*, No. 2010–CP–26–10474, involved a personal guaranty signed by John S. Divine, IV, in favor of both plaintiffs.

3. The record does not include every District letter for each restaurant account; rather, Divine included in the record letters representing the nature of the District's correspondence for both accounts.

In order to more equitably distribute costs associated with providing water and sewer service to commercial customers, the District put in place a "Demand Charge[."] The "Demand Charge" is applicable only to those commercial customers [who] consistently *exceed* the water and sewer capacity assigned to them. The capacity assigned is determined by the number of water and/or sewer impact fees *previously paid for* at a specific service location. Impact fees are determined by the *expected* water and/or sewer demand required to service a particular commercial activity. The impact fees paid by our customers are used exclusively to pay for the expansion of the plant facilities, storage, and system improvements required [for] serving all users of the water and sewer system during peak demand periods. . . .

. . . .

The "Demand Charge" is intended to (a) encourage water/sewer conservation, (b) provide capital funds necessary to expand facility capacity associated with excess demand, and (c) ensure fair and equitable rates and charges to all District customers. . . .

. . . .

You have the *option* of purchasing the *additional capacity* by paying the associated *impact fees* and eliminating or reducing the monthly Demand Charge(s). . . .

Payment of the Demand Charges shall not be considered as a credit toward the purchase of additional impact fees. A user demand analysis shall be performed each year providing the customer the *opportunity to reduce consumption* and/or to lower or eliminate the Demand Charge for the following year.

The District encourages you to review your usage records and consider any justification or methods to *reduce the usage to the assigned capacities*. . . .

(emphases added). Divine did not opt to pay impact fees to purchase additional water and sewer capacity; instead, Divine paid the monthly demand charges.

By the spring of 2013, Nichols and Divine settled their litigation by executing (1) a Consent Order allowing for the entry of judgment in favor of Nichols against Divine in the amount of $8,642,370.70; (2) a "Settlement Agreement and

Release in Full," in which Divine agreed to sell certain real estate and intellectual property to Nichols in exchange for Nichols' (a) assumption of certain debts of Divine, (b) execution of a satisfaction of judgment, and (c) request of the circuit court to terminate the receivership; and (3) an "Agreement of Purchase and Sale," covering Nichols' purchase of the real estate and intellectual property, which included Nichols' optional assumption of certain operating agreements for the Restaurants, and a marina adjacent to Divine Fish House. Specifically, the Agreement of Purchase and Sale required Nichols to pay Divine's "trade debt" that remained outstanding as of the date of the closing of the sale, which occurred on May 2–3, 2013. "Trade Debt" is defined in the Agreement of Purchase and Sale as follows:

[A]ll amounts outstanding for and from the operation of the Restaurants and Bars [that] are normal operating expenses of the Restaurants and Bars, and [that] are reasonably consistent with past operating expenses of the Restaurants and Bars. The Trade Debt includes the fee for administrative services provided to the Restaurants and Bars by Divine Dining Group, Inc. ("DDG"); provided, however, that the administrative services fees of DDG shall not exceed DDG's actual cost and shall not exceed normal rates for fees of this kind in the greater Myrtle Beach, South Carolina market area. The Trade Debt shall not include, but specifically excludes, intercompany debt owed to Divine or companies owned by Divine other than the fees due to DDG for its administrative services for the Restaurants and Bars.

The closing of the sale occurred on May 2–3, 2013. At this time, Divine presented Nichols with documentation of the outstanding trade debt. Also, at this time, the Restaurants' water and sewer accounts with the District did not show any past due charges; rather, the District had just issued a bill on May 2, 2013, the first day of the closing, and those charges were not due for payment until May 25, 2013.

After the closing, Nichols' new restaurant manager, Ernest Edwards, attempted to change the name on the Restaurants' water and sewer accounts from "John S. Divine" to "the Nichols Holdings companies" but was informed that to change the ownership of the accounts, Nichols would have to pay impact fees in the approximate amount of $53,000. The

District's Engineering Director, Tommie Kennedy, then sent a letter, dated June 17, 2013, to Nichol's counsel, explaining the District's policy for changes in ownership of water and sewer accounts as well as the history of the Restaurants' accounts. Kennedy stated, in pertinent part:

> Before the request to transfer[, Divine] had received yearly notices that the account had gone over its allocated capacity of water and sewer. In the notice[, Divine had] the *option* of buying additional capacity or incurring a *penalty.* Every year that the usage was over its allowed capacity[, Divine] elected to pay the *penalty* in lieu of purchasing additional capacity.
>
> According to District policy, change in ownership triggers a review of the account and requires that all additional capacity needed for the commercial business be purchased as if it were a new business opening up for the first time. During this review[,] staff used historical data from the account to calculate the capacity required for the business. . . .

(emphases added).

Upon learning of the impact fees required to change ownership of the accounts, Nichols refused to pay Divine's outstanding trade debt. Hence, on June 5, 2013, Divine filed a motion to enforce the Settlement Agreement and the Agreement of Purchase and Sale (collectively, the Agreements), seeking an order compelling Nichols to pay the "trade creditor debt owed at the time of the closing" of the sale and to execute documents necessary to cancel Nichols' judgment against Divine. Several weeks later, Divine offered to allow Nichols to keep the Restaurants' water and sewer accounts in Divine's name so that Nichols would not be required to pay the impact fees.

Divine then contacted Kennedy to inquire about the impact fees quoted to Edwards. Kennedy responded in a letter dated August 15, 2013, explaining the policy of reviewing accounts upon a change in ownership. In this letter, Kennedy also stated, "Any commercial account holder exceeding their purchased capacity should receive a letter every year notifying them of the overage. In the notice[,] the owner [sic] has the *option* of buying additional capacity or incurring a *penalty.*" (emphases added). On September 12, 2013, Divine sent a

letter to Kennedy, seeking information concerning the Restaurants' accounts and clarification of Kennedy's previous characterization of the demand charge as a "penalty."

In his response, Kennedy characterized the purchase of additional capacity as an option and admitted (1) there was nothing in the District's Rates and Charges Resolution characterizing a demand charge as a penalty, (2) the District had no records of ever placing a "lien" or making an "assessment" on the Restaurants or the underlying property, and (3) prior to May 2013, when Nichols purchased the Restaurants from Divine, the District had no records showing that the District's engineering department had reviewed the Restaurants' accounts and required Divine to pay additional impact fees. Kennedy also stated, "If the referenced account is not transferred and no other changes are made[,] such as remodeling or building a new building[,] then the account can continue to be billed as it is today with a demand charge instead of paying the impact fees."

On December 4, 2013, the circuit court conducted a hearing on Divine's motion to enforce the Agreements. At this time, one of Divine's attorneys testified he understood that Nichols was still using the Restaurants' water and sewer accounts in Divine's name. The circuit court later issued an order requiring Divine to pay to the District impact fees in the amount of $53,760.00 on Nichols' behalf and requiring Nichols to pay outstanding trade debt in the amount of $53,786.65. Nichols filed a "Motion for Reconsideration," and Devine filed a "Motion to Alter or Amend Order Pursuant to Rule 59(e)[, South Carolina Rules of Civil Procedure]." The circuit court denied both motions. This appeal followed.

## ISSUES ON APPEAL

1. Did the circuit court err in requiring Divine to pay impact fees when Divine had no duty to disclose to Nichols prior to closing that Divine had not purchased additional water and sewer capacity?

2. Did the circuit court err in requiring Divine to pay impact fees when Nichols incurred no damages?

3. Did the circuit court err in relying on John Divine's affidavit in determining the amount of outstanding trade debt?

4. Did the circuit court err in offsetting the amount of trade debt Nichols must pay to reflect invoices paid by Nichols but not included in Divine's trade debt evidence?

## STANDARD OF REVIEW

 "An action to construe a contract is an action at law reviewable under an 'any evidence' standard." *Pruitt v. S.C. Med. Malpractice Liab. Joint Underwriting Ass'n*, 343 S.C. 335, 339, 540 S.E.2d 843, 845 (2001). "In an action at law, tried, without a jury, the appellate court's standard of review extends only to the correction of errors of law." *Sherlock Holmes Pub, Inc. v. City of Columbia*, 389 S.C. 77, 81, 697 S.E.2d 619, 621 (Ct.App.2010) (quoting *Pope v. Gordon*, 369 S.C. 469, 474, 633 S.E.2d 148, 151 (2006)).

## LAW/ANALYSIS

### I. Duty to Disclose

Divine asserts the circuit court erred as a matter of law in requiring Divine to pay impact fees because (1) the Agreements did not impose on Divine a duty to advise Nichols that Divine had not purchased additional water and sewer capacity, and (2) paragraph 12(d) of the Agreement of Purchase and Sale required Nichols to make itself aware of the impact fees during the "Inspection Period" prior to closing. We agree.

 "In South Carolina jurisprudence, settlement agreements are viewed as contracts." *Pee Dee Stores, Inc. v. Doyle*, 381 S.C. 234, 241, 672 S.E.2d 799, 802 (Ct.App.2009). "The court's duty is to enforce the contract made by the parties regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully." *Ellis v. Taylor*, 316 S.C. 245, 248, 449 S.E.2d 487, 488 (1994). Rather, interpretation of a contract "is governed by the objective manifestation of the parties' assent at the time the contract was made," rather than "the subjective, after the fact meaning one party assigns to it." *Bannon v. Knauss*, 282 S.C. 589, 593, 320 S.E.2d 470, 472 (Ct.App.1984).

In other words, the court must ascertain and give effect to the intention of the parties, looking first to the language of the contract. *Wallace v. Day,* 390 S.C. 69, 74, 700 S.E.2d 446, 449 (Ct.App.2010). "When the language of a contract is clear and unambiguous, the determination of the parties' intent is a question of law for the court." *Id.* "The court is without authority to consider parties' secret intentions, and therefore words cannot be read into a contract to impart an intent unexpressed when the contract was executed." *Pee Dee,* 381 S.C. at 241, 672 S.E.2d at 802.

Here, the circuit court relied on paragraphs 15(f) and 15(h) in concluding, "Divine had a duty under the terms of the contract to advise [Nichols] that he had not purchased additional water and sewer capacity prior to the sale." We will address the application of these provisions in turn.

Paragraph 15(f) of the Agreement of Purchase and Sale states:

There are no service, maintenance, property management, leasing or other *contracts affecting the Property* [that] will be in existence *as of the Closing Date,* other than the Operating Agreements described on **Exhibit C** that [Nichols] elects to assume as provided in Paragraph 10(e), or for which notices of termination have been delivered as provided in Paragraph 10(e). [Divine has] fulfilled all of its duties and obligations in connection with the Operating Agreements, and [Divine is] not in default in any material respect under any of the terms and provisions of the Operating Agreements. To the best knowledge of [Divine], no other party is in default in any material respect under its Operating Agreement, and no event has occurred, [that], with the passage of time, would become a default under any Operating Agreement.

(first and second emphases added).

These terms did not require Divine to advise Nichols that Divine had not purchased additional water and sewer capacity. Even if the Restaurants' water and sewer accounts can be characterized as "contracts affecting the Property" that still existed at the time of closing, neither Nichols nor the circuit court charged Divine with failing to disclose the continued existence of the accounts. Further, even if the accounts

should have been included as two of the "Operating Agreements" listed in Exhibit C to the Agreement of Purchase and Sale, there was no evidence that Divine was "in default in any material respect" concerning the accounts or failed to fulfill "all of its duties and obligations in connection with" the accounts. In fact, the District's "rates and regulations" for customer accounts, attached to the District's June 7, 2012 Resolution, make the purchase of additional capacity to eliminate demand charges an option rather than a requirement. This document also indicates customers may choose to reduce their water usage rather than paying a large sum of money for additional capacity they may not truly need. Thus, as a matter of law, Divine was not required to purchase additional capacity for the Restaurants' accounts with the District.

While the District's Engineering Director, Tommie Kennedy, initially characterized a demand charge as a "penalty" in his June 17 and August 15, 2013 correspondence, in his September 16, 2013 correspondence, Kennedy admitted (1) there is nothing in the District's Rates and Charges Resolution characterizing a demand charge as a penalty; (2) the District has no records of ever placing a "lien" or making an "assessment" on the Restaurants or the underlying property;[4] and (3) prior to May 2013, when Nichols purchased the Restaurants and became responsible for paying their utility bills, the District had no records showing that the District's engineering department had reviewed the Restaurants' accounts and required Divine to pay additional impact fees. Kennedy characterized the purchase of additional impact fees as an option and also stated, "If the referenced account is not transferred and no other changes are made[,] such as remodeling or building a new building[,] then the account can continue to be billed as it is today with a demand charge instead of paying the impact fees."

---

4. In its order, the circuit court implied that Divine misrepresented its payment of "all assessments against [Divine]" on a title insurance affidavit signed at closing. The circuit court quoted the following language from the affidavit: "[A]ll assessments against [Divine] or applicable to the real estate[,] including assessments for street lighting, water and sewer construction, sanitary assessments and other governmental services[,] have been paid in full...." However, the evidence shows the District never imposed an assessment on the Restaurants' water and sewer accounts.

Moreover, the District's "Finance/Administration Director," John Buck, expressly characterized purchasing additional capacity as an option in his 2012 notice of the imposition of a demand charge: "You have the *option* of purchasing the additional capacity by paying the associated impact fees and eliminating or reducing the monthly Demand Charge(s)." (emphasis added). Buck also indicated this option is given to the District's customers so that they may choose to reduce their water usage rather than investing a large sum of money in additional capacity they may not truly need:

The "Demand Charge" is intended to (a) *encourage water/sewer conservation*, (b) provide capital funds necessary to expand facility capacity associated with excess demand, and (c) ensure fair and equitable rates and charges to all District customers....

. . . .

Payment of the Demand Charges shall not be considered as a credit toward the purchase of additional impact fees. A user demand analysis shall be performed each year providing the customer the *opportunity to reduce consumption* and/or to lower or eliminate the Demand Charge for the following year.

The District encourages you to review your usage records and consider any justification or methods to *reduce the usage to the assigned capacities.*

(emphases added). In fact, Divine followed Buck's recommendation by reducing the peak water usage at Divine Fish House from sixty-six "Residential Equivalency Units" to fifty-seven such units over the course of a year.

Based on the foregoing, the evidence before the circuit court demonstrates Divine was not in default on its accounts with the District.

 The circuit court also relied on paragraph 15(h) of the Agreement of Purchase and Sale in concluding Divine had a duty to advise Nichols that Divine had not purchased additional water and sewer capacity. Paragraph 15(h) states:

[Divine has] received no notice of administrative agency *action, litigation, condemnation proceeding or proceeding of any kind* pending against [Divine that] relates to or affects the Property, including any requests for public dedi-

cation, nor [does Divine] know of any basis for any such action, other than collection actions relating to the Debts. [Divine has] no knowledge of any pending or contemplated public improvements in or about the Property [that] may in any manner increase the *taxes or assessments* levied against the Real Property. [Divine has] no knowledge of any proposal to change, limit or deny access to the Real Property from any adjacent publicly dedicated and maintained street(s).

(emphases added).

The Restaurants' water and sewer accounts do not fall within the scope of the legal proceedings referenced in paragraph 15(h). Additionally, Paragraph 12(d) of the Agreement of Purchase and Sale states, in pertinent part:

[Nichols'] obligations under this Agreement shall be subject to the satisfaction, during the applicable time period set forth below, of the following conditions (any of which may be waived by [Nichols] by giving written notice of waiver to [Divine]):

. . . .

(d) [Nichols], during the Inspection Period,[5] shall have satisfied itself, in its sole discretion, as to the physical condition of the Improvements, and as to the availability of and *capacity of water, sanitary sewer,* storm water management, electricity, natural gas, telephone, cable television and *other utilities* serving the Property.

. . . .

If any of the foregoing conditions have not been satisfied or waived by the end of the time [ ] frame set forth above, [Nichols] shall have the right, exercisable by delivery of written notice to [Divine] on or before that date, to terminate this Agreement, and upon such termination, this Agreement shall be deemed null and void. *If [Nichols] fails to deliver such written notice of termination during the*

---

5. The term "Inspection Period" is defined in the Agreement of Purchase and Sale as "beginning on the Effective Date and ending on the latter of (i) the date ten (10) days after the Effective Date, or (ii) ten (10) business days after [Nichols] has received its survey, title exam, environmental assessment [that] it has commissioned and received [Divine's] Due Diligence documents." The "Effective Date" is defined as the date entered on the Agreement of Purchase and Sale.

*Inspection Period, [Nichols] shall be deemed to have waived the conditions set forth in Section 2 and Paragraphs 12(a) through 12(d).*

(emphases added).

If Nichols had contacted the District during the Inspection Period to inquire about the Restaurants' accounts rather than waiting until after the closing to do so, Nichols would have learned of the requirement that the impact fees be paid as a prerequisite to changing the name on the accounts.[6] Nichols could have then opted to terminate the Agreements before the end of the Inspection Period. Because Nichols did not satisfy itself as to the capacity of the Restaurants' water and sewer accounts, Nichols waived this condition.

Based on the foregoing, Divine did not have a contractual duty to advise Nichols that Divine had not purchased additional water and sewer capacity. As previously stated, the purchase of additional capacity was merely an option for Divine to consider along with the equally acceptable alternative of paying the District's demand charges and attempting to reduce water usage. Therefore, the circuit court erred as a matter of law in concluding that the Agreements imposed on Divine a duty to advise Nichols that Divine had not purchased additional water and sewer capacity.[7]

## II. Trade Debt

Nichols contends the circuit court erred in finding Nichols owed $53,786.65 to Divine's vendors for trade debt, rather than the amount of $42,877.59 indicated by the receiver,[8]

---

6. This requirement was also published in the attachments to the District's June 7, 2012 Resolution: "[The water impact fee] applies to anyone requesting new water service...."

7. In light of this holding, we need not address Divine's argument that Nichols incurred no damages. *See Futch v. McAllister Towing of Georgetown, Inc.,* 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (holding an appellate court need not address the remaining issues on appeal when resolution of a prior issue is dispositive).

8. The receiver's October 23, 2013 affidavit indicated the amount of reasonable trade debt owed by Nichols was $45,673. However, at the motions hearing, the receiver testified that the amount of $2,795.41 should be subtracted from the amount stated in her affidavit to give

because there was no evidence to support this finding. Specifically, Nichols challenges the circuit court's reliance on John Divine's affidavit in determining the amount of outstanding trade debt.

Initially, we note that Nichols' motion for reconsideration failed to challenge the circuit court's finding on the amount of outstanding trade debt on the ground that there was no supporting evidence. Rather, the motion challenged the circuit court's trade debt figure on the ground that it did not credit Nichols for the water and sewer fees and demand charges it paid. Further, for the *first time* in his reply brief, Nichols challenges the competency of John Divine's affidavit, invoking Rule 43(a) of the South Carolina Rules of Civil Procedure and asserting Rule 43 "does not allow for the presentation of affidavits at trial." Therefore, these arguments are not preserved for our review. *See State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 694 (2003) ("A party need not use the exact name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground."); *State v. Prioleau*, 345 S.C. 404, 411, 548 S.E.2d 213, 216 (2001) ("In order to preserve for review an alleged error in admitting evidence[,] an objection should be sufficiently specific to bring into focus the precise nature of the alleged error so it can be reasonably understood by the trial judge."); *id.* ("[A] party may not argue one ground at trial and an alternate ground on appeal."); *Spivey ex rel. Spivey v. Carolina Crawler*, 367 S.C. 154, 161, 624 S.E.2d 435, 438 (Ct.App.2005) (declining to consider issues raised for the first time in the appellants' reply brief).

Even if these arguments had been properly preserved, under Rule 43(e), SCRCP, the circuit court had the discretion to hear Divine's motion to enforce the Settlement Agreement on affidavits in lieu of oral testimony. *See* Rule 43(e), SCRCP ("When a *motion* is based on facts not appearing of record[,] the court *may hear the matter on affidavits presented by the respective parties*[ ] but *may* direct that the matter be heard wholly or partly on oral testimony or depositions." (emphases added)). Further, when Divine's counsel

Nichols credit for Divine's agreement to transfer certain funds held in trust to Nichols.

offered to substitute John Divine's affidavit for his own live testimony "in the interest of time," Nichols failed to request an opportunity to cross-examine Mr. Divine on his affidavit. Therefore, the circuit court properly considered Mr. Divine's affidavit in lieu of his testimony.

Nichols claims the circuit court "chose to discount and not consider Divine's [a]ffidavit because of his failure to testify in the trial." However, there is nothing in the record to support this claim. In fact, in announcing its ruling, the circuit court stated it considered

the matters as filed by the parties in this case, all of their memorand[a], the affidavits of the parties, as well as today I've heard the testimony of the witnesses [who] have been presented. . . . I have relied upon the entirety of the record before me as reflected in the Clerk of Court's file and through the testimony here today.

Further, using the exact amount indicated in John Divine's affidavit, $62,809.08,[9] as a starting point in determining the amount of outstanding trade debt, the circuit court obviously considered Mr. Divine's affidavit without objection from Nichols. Therefore, we reject Nichols' challenge to the circuit court's reliance on Mr. Divine's affidavit in determining the amount of outstanding trade debt.

## III. Offset

Divine contends the circuit court erred in offsetting the amount of outstanding trade debt by $9,022.43 for invoices paid by Nichols but not included in Divine's trade debt evidence. We agree.

During the motions hearing, the receiver, Arlene Jaskot, testified regarding her October 23, 2013 affidavit, which concluded that the reasonable trade debt *as of the date of the closing on May 2–3, 2013,* was $17,827.41 for Bovine's and $27,845.59 for Divine Fish House, or $45,673.00 for both restaurants.

---

9. We note Nichols has never challenged the circuit court's reliance on the amount of outstanding trade debt indicated in Mr. Divine's affidavit on the ground that this amount does not accurately reflect the total of the attached invoices.

In its written order, the circuit court indicated it was relying on John Divine's affidavit rather than Jaskot's affidavit in determining the outstanding trade debt:

[T]he [c]ourt finds ... that the Trade Debt [that] Nichols ... owes Divine is $62,809.08[, the amount indicated in John Divine's affidavit,] and that all vendors shall be paid with one caveat. The [c]ourt heard the testimony of the receiver, Arlene Jaskot, and reviewed her affidavits.... The [a]ffidavits of Arlene Jaskot indicate that some of the Trade Debt has been paid by Nichols. The [c]ourt finds that Nichols has produced the following invoices for Trade Debt that he has paid, which shall reduce the Trade Debt owed in the amount of $9,022.43.

Those include the following:

| | | |
|---|---|---|
| 1. Roper | $1,751.27 | |
| 2. Santee Cooper | $3,126.58 | (Divine's) |
| 3. Santee Cooper | $3,129.66 | (Bovines) |
| 4. Horry Telephone | $1,014.92 | |
| Total | $9,022.43 | |

As a result of these checks (or paid invoices) being produced to the [c]ourt, the Trade Debt to be paid to the vendors is $53,786.65.

The circuit court's finding that these four items should be deducted from the amount indicated in John Divine's affidavit was likely based on one or both of the following assumptions: (1) Mr. Divine's affidavit, which was dated October 10, 2013, and the attached invoices demonstrated trade debt outstanding *as of the date of closing,* May 2–3, 2013, like Jaskot's affidavit did, and, (2) therefore, Mr. Divine's affidavit and attached invoices included the four items listed above as still outstanding. However, the invoices for these four items were not included in those invoices attached to Mr. Divine's affidavit and represented as unpaid. Hence, the amount of $62,809.08 set forth in Mr. Divine's affidavit as reflecting the invoices still outstanding *as of October 10, 2013* did not include the above amounts for Roper, Santee Cooper, and Horry Telephone precisely because by that time they had already been paid. Thus, Divine had already given Nichols credit for its payments to these creditors when Divine presented its evidence of outstanding trade debt to the circuit court. Therefore, the circuit court mistakenly doubled Nichols' credit for these

payments when it deducted them from the $62,809.08 indicated in Mr. Divine's affidavit.

Based on the foregoing, there was no evidence to support the circuit court's finding that Nichols' payments to Roper, Santee Cooper, and Horry Telephone should be deducted from the amount of outstanding trade debt indicated in John Divine's affidavit.

## CONCLUSION

Accordingly, the circuit court erred in requiring Divine to pay impact fees to the District. As to outstanding trade debt, the circuit court properly relied on John Divine's affidavit but erroneously deducted $9,022.43 from the $62,809.08 indicated in Mr. Divine's affidavit. Therefore, we reverse the circuit court and remand with instructions to require Nichols' payment of all vendor invoices attached to Mr. Divine's affidavit.

**REVERSED and REMANDED.**

SHORT and McDONALD, JJ., concur.