720 S.E.2d 503

**SOUTH CAROLINA DEPARTMENT OF SOCIAL SERVICES, Respondent,**

**v.**

**MARY C. and Daniel C., Defendants,**

**Of Whom Mary C. is the, Appellant,**

and

**Daniel C. is the, Respondent.**

**Mary C., Appellant,**

**v.**

**Daniel C, Respondent.**

**No. 4891.**

Court of Appeals of South Carolina.

Heard June 7, 2011.

Decided Sept. 21, 2011.

Rehearing Denied Dec. 21, 2011.

16

David Michael Collins, Jr., and J. Benjamin Stevens, both of Spartanburg; for Appellant.

Albert V. Smith, of Spartanburg; for Respondent Daniel C.

Deborah Murdock, of Mauldin; for Respondent South Carolina Department of Social Services.

Catherine Christophilis, of Greenville; Guardian ad Litem.

Virginia Ravenel, of Columbia; Robert Clark and Don Stevenson, both of Greenville; for Respondent Guardian ad Litem.

WILLIAMS, J.

On appeal from the family court, Mary C. (Mother) argues the family court improperly weighed the evidence in a South Carolina Department of Social Services (DSS) intervention action regarding the identity of her daughter's (Anna G.) sexual abuser. In addition, Mother claims the family court erred in assessing attorney's fees against Mother for the substitute counsel representing the volunteer guardian ad litem in the DSS intervention action and in assessing guardian

ad litem fees against Mother for the appointed guardian in the private custody action. We affirm in part and reverse in part.

## FACTS

Mother and Daniel C. (Father) were never married but had one child together, Anna G., who was born on December 11, 2004. Shortly after Anna G.'s birth, Mother filed a private custody action on March 4, 2005, against Father, requesting custody of Anna G., child support, contribution from Father for medical expenses from Mother's pregnancy, past and future medical expenses for Anna G., a visitation schedule, and attorney's fees and costs. In his Answer, Father admitted paternity and agreed to Mother's claims for custody and child support but denied responsibility for Mother's pregnancy costs and attorney's fees.

On June 22, 2007, the parties consented to the appointment of a guardian ad litem (GAL), Catherine Christophilis, in the private custody action. Approximately three months later, Anna G.'s counselor notified DSS she believed Father was sexually abusing Anna G. based on Anna G.'s behavior and statements during the child's therapy sessions. The family court suspended Father's visitation rights while DSS investigated the sexual abuse allegations. After issuing its report, DSS filed an intervention action on March 17, 2008, against Mother and Father, alleging Anna G.'s placement with Father put child at substantial risk of sexual abuse. Father filed an Answer denying the allegations of abuse. Mother filed no responsive pleadings. At that time, a volunteer GAL, Colleen Hinton, was assigned to represent Anna G. in the intervention action.[1]

On May 22, 2008, the family court issued a sua sponte order to continue the final hearing in the private custody action until

---

1. Mr. Clark and Mother agree in their briefs that under the GAL Program, a staff attorney is employed on a contract basis to represent the volunteer GAL assigned to any abuse and neglect case. In this case, Robert Clark was assigned to represent Colleen Hinton, the volunteer GAL, for the intervention action. Subsequently, Mr. Clark hired Don J. Stevenson to cover the intervention portion of this case because Mr. Clark was already scheduled to be in court for DSS the same week. Mr. Clark filed a motion for attorney's fees on July 29, 2008, which the family court heard on January 8, 2009.

the sexual abuse allegations in the intervention action were litigated. Then, on August 4, 2008, the family court issued a pre-trial order consolidating the private custody action and the intervention action because "the issues involved in each [were] intertwined and closely related."

The family court held a hearing to resolve the allegations of sexual abuse on September 22 to 26, 2008, October 22, 2008, and January 8, 2009. Although the family court initially consolidated the cases, the family court ruled it would only try the intervention action during the seven-day scheduled hearing because the issues in the custody action could not be addressed until it resolved the allegations of sexual abuse. After hearing testimony from numerous witnesses over the course of seven days, the family court found Anna G. was sexually abused but the perpetrator was unknown. The family court required Mother and Father to *each* pay the GAL $2,500 in fees for her services in the private custody action. In addition, the family court held Mother and Father must pay $2,593.75 to the substitute attorney (hired by appointed counsel) to represent the volunteer GAL in the intervention action. The family court then ordered that "the DSS portion of this case shall be closed, and DSS shall be dismissed from this action." Neither party objected to or appealed the family court's decision to close the intervention portion of the case. Mother then filed a Rule 59(e), SCRCP, motion to reconsider, which the family court denied. Mother appealed.[2] Neither DSS nor the guardians contest the family court's rulings.

---

2. We note the family court consolidated the intervention and private custody action but only ruled on the intervention portion of the action prior to Mother's appeal to this court. Generally, an order that leaves some further act to be accomplished is considered interlocutory. *See Bolding v. Bolding*, 283 S.C. 501, 502, 323 S.E.2d 535, 536 (Ct.App. 1984) (dismissing appeal when order appealed from did not finally dispose of the whole subject matter in litigation). However, both parties agree, and we find, the intervention portion of this action should be addressed. First, the parties agree that the family court issued a final order in the DSS portion and separated these cases by consent. Second, we should address these issues based on the equities involved in this case and the best interests of Anna G. She has not seen Father since the family court issued its order, and because the family court has taken no further action in the custody portion of this case, we find dismissal under the circumstances would create an injustice to not only the parties, but more importantly, to Anna G. Additionally, we find

## STANDARD OF REVIEW

 On appeal from the family court, this court reviews factual and legal issues de novo. *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011); *Lewis v. Lewis*, 392 S.C. 381, 386, 709 S.E.2d 650, 651–52 (2011). Although this court reviews the family court's findings de novo, we are not required to ignore the fact that the trial court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony. *Lewis*, 392 S.C. at 385, 709 S.E.2d at 651–52. The burden is upon the appellant to convince this court that the family court erred in its findings. *Id.*

## LAW/ANALYSIS

### A. Identity of Child's Sexual Abuser

 Mother claims the family court erred in finding that an unknown perpetrator, as opposed to Father, sexually abused Anna G. because DSS established by a preponderance of the evidence that Father abused Anna G. We disagree.

Pursuant to section 63–7–1650 of the South Carolina Code (2010), DSS may petition the family court for authority to intervene and provide protective services without removal of custody if DSS concludes by a preponderance of the evidence the child is an abused or neglected child and the child cannot be protected from harm without intervention. *See* § 63–7–1650(A). The family court must hold a hearing to determine whether intervention is necessary within thirty-five days of the filing date. *See* § 63–7–1650(C). Intervention and protective services must not be ordered unless the family court finds

---

support for our decision from *Hooper v. Rockwell* 334 S.C. 281, 291, 513 S.E.2d 358, 364 (1999), in which the supreme court held that an order issued after a merits hearing in a removal proceeding is immediately appealable. The supreme court stated,

[A]ny order issued as a result of a merit hearing, as well as any later order issued with regard to treatment, placement, or permanent plan, is a final order that a party must timely appeal. At that point, investigators and DSS have presented evidence to the family court, the parents or guardians of the child have had an opportunity to challenge the evidence and present their case, and the family court has decided whether the allegations of the removal petition are supported by a preponderance of the evidence. . . .

the allegations of the petition are supported by a preponderance of the evidence, including a finding the child is an abused or neglected child and the child cannot be protected from further harm without intervention. *See* § 63–7–1650(E).

The following evidence was adduced at the seven-day intervention hearing prior to the family court issuing an order finding DSS failed to prove by a preponderance of the evidence that an unknown perpetrator, as opposed to Father, sexually abused Anna G.

Mother and Father met as co-workers at an airline in Greenville, South Carolina. Eventually, Mother and Father commenced a romantic relationship, yet each maintained opposite accounts of their first sexual encounter. In finding the history of the parties' relationship was pertinent to the case, the family court noted the variations in their stories and found Father's version to be credible.[3] At trial, Mother stated she did not remember having sex with Father because of an adverse reaction from a pain medication mixed with alcohol, whereas Father said they were sober and it was a consensual sexual encounter. In any event, the family court found and both parties admitted to having repeated consensual sexual encounters before Mother conceived Anna G. Father admitted to encouraging Mother to obtain an abortion and to cutting off contact with Mother until shortly before Anna G. was born but stated he changed his mind and wanted to become involved in the child's life before Mother gave birth to Anna G.

Mother initially permitted Father informal supervised visitation with Anna G. Approximately three months after Anna G. was born, Mother petitioned the family court for a formal visitation schedule as well as child support. Beginning in April 2005, the family court established a regular visitation schedule for Father with Anna G., which did not include overnight visitation. Father successfully increased his visitation with Anna G., but he was not awarded overnight visitation until July 2007. No allegations of sexual abuse were made

---

3. The family court found, "[Mother's] parents were less than happy with this interracial relationship and most distressed when she became pregnant. I believe her version of the initial sexual encounter with [Father] is responsive to her parents' negative reaction to this relationship, thereby diminishing her accountability in this relationship."

prior to the commencement of Anna G.'s overnight visitation with Father.

In May 2007, shortly before Anna G.'s overnight visitation was to begin with Father, Mother scheduled therapy sessions with Ms. Meredith Thompson–Loftis, a specialist in sexual abuse and post-traumatic stress disorders. Ms. Loftis testified that Anna G., who was almost three years old, began to display sexualized behaviors in August 2007, which included masturbating in front of Ms. Loftis, urinating on the floor despite being potty-trained, and stating after prompting from Ms. Loftis that she, her sister, and Father touched and licked her "bottom," [4] while all were in Father's bed.

Ms. Lynn McMillan, an expert in forensic interviewing of child abuse, testified before the family court. Ms. McMillan stated Anna G. made disclosures about being sexually abused by her sisters and Father in her forensic interview.

Ms. Cindy Stichnoch, an expert in the assessment and treatment of sexual behavior issues in children, testified before the family court. Ms. Stichnoch reviewed the DSS files; the written reports and videos from Anna G.'s sessions with Ms. Loftis and Ms. McMillan; treatment records from Anna G.'s pediatricians; Father's polygraph results; interview reports and affidavits from Mother, Father, and Father's two daughters; and the GALs' reports. Ms. Stichnoch was highly critical of Ms. Loftis' interviewing techniques, specifically her continuing to have therapy sessions with Anna G. about the sexual abuse allegations until a full assessment was conducted. Ms. Stichnoch stated a child of Anna G.'s age is easily influenced, and repetitive sessions and questions about the allegations could inadvertently and inappropriately reinforce those allegations with the child. Ms. Stichnoch also opined that Ms. McMillan inappropriately led Anna G. and continued to repeat the same questions to the child until she was satisfied with Anna G.'s responses.

Dr. Selman Watson, an expert in clinical and forensic psychology, testified at the hearing regarding his psychological evaluations of Mother and Father. Dr. Watson said Father was not a pedophile, and while Dr. Watson believed Anna G.

---

4. Ms. Loftis testified "bottom" was Anna G.'s word for her vaginal and anal area.

had been sexually abused, he could not conclude with a reasonable degree of medical certainty that Father was the perpetrator.

Dr. Tracy Butcher, Anna G.'s pediatrician, also testified at the intervention hearing. She stated Mother had brought Anna G. to her office for numerous health and allergy issues since Anna G. was born. Mother reported Anna G. suffered from nightmares and sleeping disturbances as early as May 2006, but Dr. Butcher stated Mother's concerns over these issues escalated after overnight visitation commenced. Dr. Butcher testified she was concerned that Anna G. was still breastfeeding at twenty-four months because the child was using this to manipulate Mother. When questioned on cross-examination, Dr. Butcher testified she never observed any indicators that Anna G. was being sexually abused.

Father's two daughters, Jacqueline and Victoria, testified at trial. Both strongly denied that Father had ever acted inappropriately, either towards them or towards Anna G. Jacqueline, who was twenty on the date of trial, stated both she and her sister had a close relationship with Anna G. Jacqueline stated she had slept in the same bed with Father and had also slept in the same bed with Anna G. and her sister, Victoria, but nothing inappropriate happened during those times, and at no point had he ever sexually abused her. Jacqueline also testified she had never seen Anna G. act out as she had in the presence of Mother or her therapist. Father's older daughter, Victoria, who was twenty-two at the time of the hearing, stated Father was loving and caring and taught his daughters how to be responsible. Victoria testified that because she works with young children as an early childhood major, she knows the differences between "what's curious ... [and] what's weird. [Anna G.] act[s] just as normal with me as everybody else." Victoria stated while she considered herself "friends" with Mother before the sexual abuse allegations arose, she considered Mother to be overbearing and overprotective, particularly with her instructions to Father on how to parent and care for Anna G. while in Father's custody.

Father's ex-wife, Gwendolyn C., also testified at the intervention hearing. She stated that despite being divorced, she and Father raised Jacqueline and Victoria together, and she

never had any reason to believe he inappropriately touched one of their children. While Gwendolyn stated she had to seek court action to require Father to pay child support, she said he was a good father to her daughters and to Anna G. and that based on her observations, Anna G. was extremely affectionate towards and attached to Father.

After hearing testimony over the course of seven days, the family court issued a thirteen-page order, in which it found Anna G. had displayed sexualized behavior, but it could not find by a preponderance of the evidence that Father was the perpetrator. In so finding, the family court held Anna G.'s disclosures were not trustworthy based on the methodology employed by her therapists in eliciting her sexual abuse disclosures. The family court relied on Ms. Stichnoch's and Dr. Watson's conclusions that Anna G.'s therapists engaged in inappropriate leading and suggestive tactics, which were well below the appropriate standard and protocol for such interviews.

Moreover, in explaining the sexual abuse allegations, the family court held Anna G. had an extensive medical history, including digestive and reflux issues, allergies, as well as vaginal soreness and redness, all which were medically documented prior to any abuse allegations. In reviewing the child's medical records, the family court found Anna G.'s yeast infections and diaper rash were to be treated with ointment prescriptions applied to her vaginal area two to four times per day, and these treatments coincided with Anna G.'s statements that Father touched her "bottom."

The family court emphasized Mother was controlling and micromanaging when it came to Father's visitation and his relationship with Anna G. Both Father and his daughters testified Mother was overbearing when it came to Anna G.'s care while in Father's custody, and the family court found the daughters' testimony to be "extremely credible." A review of Mother's extremely detailed food log and daily routine schedule as well as Mother's medication, vitamin, and supplement instructions to Father supports this conclusion.

While Mother clearly cares greatly for her child, we agree with the family court's finding that the conflict in the parties' parenting skills and Mother's desire to micromanage Father's

visitation with Anna G. has partially contributed to the circumstances surrounding these allegations. Moreover, we find it troubling, as did the family court, that Anna G. continued to "display the level of sexualized behavior and distress after having absolutely *no contact or visitation with* [Father] *in over one full year.*"

■ While this court has jurisdiction in an intervention action to find facts based on our own view of the preponderance of evidence, when evidence presented in the record adequately supports the findings of the family court, due deference should be given to the family court's judgment based on its superior position in weighing such evidence. *Aiken Cnty. Dep't of Soc. Servs. v. Wilcox*, 304 S.C. 90, 93, 403 S.E.2d 142, 144 (Ct.App.1991). Based on the voluminous testimony from numerous witnesses, we strongly believe the family court was in the best position to determine whether Anna G. was being abused by Father. *See Hooper*, 334 S.C. at 297, 513 S.E.2d at 367 ("The appellate court is not, however, required to ignore the fact that the family court, who saw and heard the witnesses, was in a better position to evaluate their credibility and assign comparative weight to their testimony."). While we recognize conflicting evidence was presented to the family court, we find ample evidence in the record to support the family court's findings and conclusions and thus defer to the family court on this issue. *Epperly v. Epperly*, 312 S.C. 411, 414, 440 S.E.2d 884, 885–86 (1994) ("Since the testimony on this issue is so divergent, we adopt the findings of the Family Court on this issue as the sitting judge was in the best position to determine the credibility of the witnesses.").

## B. Award of Attorney's Fees in DSS Action

■ Mother claims the family court committed reversible error when it required her to pay a portion of counsel's attorney's fees because the GAL Program, not Mother, was required to pay appointed counsel for representing the volunteer GAL in this abuse and neglect proceeding. We agree.

The GAL Program, including the services it provides by way of its volunteer GALs, is a creature of state statute, both in funding and in administration. *See* S.C.Code Ann. § 63–

11–570 (2010) ("The General Assembly shall provide the funds necessary for the South Carolina Guardian ad Litem Program to carry out the provisions of [the GAL Program] . . . ."); *see also* S.C.Code Ann. § 63–11–500 (2010) ("This program must be administered by the Office of the Governor."); S.C.Code Ann. § 1–30–110 (2010) (requiring all funds associated with the GAL Program be administered by the Office of the Governor).

The purpose of the GAL Program is to provide volunteer GALs to serve as court-appointed special advocates for children in abuse and neglect proceedings. *See* § 63–11–500 ("This program shall serve as a statewide system to provide training and supervision to volunteers who serve as court-appointed special advocates for children in abuse and neglect proceedings within the family court, pursuant to Section 63–7–1620."); *see also* S.C.Code Ann. § 63–7–1620(1) (Supp.2010) ("In all child abuse and neglect proceedings . . . [c]hildren must be appointed a GAL by the family court."). Once appointed, legal counsel must be provided to the GAL during the pendency of the abuse and neglect proceeding. *See id.* ("A GAL serving on behalf of the South Carolina Guardian ad Litem Program or Richland County CASA must be represented by legal counsel in any judicial proceeding pursuant to Section 63–11–530(C).").

In this case, the legal counsel provided by the GAL Program, Mr. Clark, had scheduling conflicts with other cases and chose to hire another attorney, Mr. Stevenson, to represent the volunteer GAL in the hearing before the family court. Mr. Clark admitted he is paid a flat fee by the GAL Program to represent volunteer GALs. Mr. Clark then sought to recover attorney's fees on Mr. Stevenson's behalf at the close [5] of the intervention action.

In support of the family court's award of attorney's fees, Mr. Clark cites to Rule 41(a), SCRFC,[6] as authority to assess attorney's fees greater than $100 against Mother based on

---

5. Mr. Clark submitted a motion to require Mother and Father pay attorney's fees prior to trial, but the family court did not rule on his motion until after trial was concluded.

6. Rule 41, SCRFC, states:
 (a) **Limitation on Fees.** In all child abuse and neglect proceedings, the court shall grant to legal counsel appointed for the child subject

"extraordinary circumstances." However, Rule 41(a) only pertains to "legal counsel appointed for the *child* [.]" (emphasis added). Moreover, section 63–7–1620(2) clearly states legal counsel for the child in an abuse and neglect proceeding is *not* the same as legal counsel for the GAL. *See* § 63–7–1620(2) ("The family court may appoint legal counsel for the child. Counsel for the child may not be the same as counsel for ... the child's guardian ad litem."). Because the plain language of Rule 41 clearly does not pertain to legal counsel appointed for *the GAL*, we find Rule 41 inapplicable.

Mr. Clark also contends that Mother should be responsible for paying these fees, despite the GAL Program being funded by the General Assembly, because the family court has the statutory authority to assess attorney's fees against any party subject to its jurisdiction. We disagree.

■ First, we find the family court has the authority to assess attorney's fees against parties subject to its jurisdiction pursuant to section 63–3–530(38) of the South Carolina Code (Supp.2010) [7] as well as Rule 12, SCRFC.[8]

Despite the family court's broad authority under 63–3–530, we find the General Assembly did not intend for parties in abuse and neglect proceedings to pay legal counsel's attor-

---

to child abuse and/or neglect proceedings, a fee not to exceed One Hundred ($100.00) Dollars. The court shall grant to a guardian ad litem appointed for a child subject to such proceedings a fee not to exceed Fifty ($50.00) Dollars.

**(b) Exceptions.** If the court determines that extraordinary circumstances require the award of a fee larger than that which is specified in this rule, the court shall set forth in its order the salient facts upon which the extraordinary circumstances are based and shall award a fee to appointed legal counsel or guardian ad litem in an amount which the court determines to be just and proper.

7. Section 63–3–530(38) grants the family court exclusive jurisdiction to hear and determine an action where either party in his or her complaint, answer, counterclaim, or motion for pendente lite relief prays for the allowance of suit money pendente lite and permanently. In this action the court shall allow a reasonable sum for the claim if it appears well-founded. Suit money, including attorney's fees, may be assessed for or against a party to an action brought in or subject to the jurisdiction of the family court. . . .

8. Rule 12, SCRFC, states, "If a guardian ad litem is represented by an attorney, the court in its discretion may assess reasonable attorneys' fees and costs."

ney's fees when representing volunteer GALs. *See Spartan-burg Co. Dept. of Soc. Servs. v. Little,* 309 S.C. 122, 420 S.E.2d 499 (1992) (finding section 20–7–420(38) (currently 63–3–530(38)), which gives the family court authority to award attorney's fees against a party, is a statute of general authority that may be overridden by a more specific statute limiting the family court's authority). The provisions of the GAL Program, which necessarily include payment of the GAL Program's legal counsel, are statutorily required to be funded by the legislative branch and to be administered by the executive branch. *See* §§ 63–11–500, –570. Because the General Assembly has already provided for payment of the GAL Program's attorneys, we find Mother should not also be required to pay attorney's fees.

In this instance, the GAL Program paid Mr. Clark a flat fee for his services as part of Mr. Clark's contract with the GAL Program. Mr. Clark stated he had scheduling conflicts with other cases; however, instead of seeking a continuance, in this or any of his other cases, he chose to hire Mr. Stevenson to represent the volunteer GAL. Mr. Clark then sought to recover attorney's fees for Mr. Stevenson's services from Mother. Mr. Clark points to no authority that allows him to seek payment for a substitute attorney chosen by Mr. Clark when Mr. Clark is already being paid by the GAL Program. The substitution of counsel was not due to a conflict in the case that required Mr. Clark's withdrawal but rather out of convenience and as an alternative to seeking a continuance. In similar circumstances, many lawyers who are appointed in abuse and neglect proceedings choose to hire substitute counsel in lieu of serving as appointed counsel. In these instances, the fee arrangement is between the lawyers.

Moreover, if Mr. Clark and the GAL Program are contractually obligated to one another, we do not see how Mr. Clark's decision to hire substitute counsel due to scheduling conflicts should work a financial detriment to Mother. While Mr. Clark was required to represent the GAL by virtue of his contract with the GAL Program, neither the GAL nor Mother were contractually obligated to Mr. Clark. Because Mr. Clark presented no evidence that he incurred any fees, we find it inappropriate to award fees against Mother. *See generally Williamson v. Middleton,* 383 S.C. 490, 495–96, 681 S.E.2d 867, 870–71 (2009) (finding attorney could not recover attor-

ney's fees when attorney presented no evidence that client actually incurred fees and when no fee agreement existed between the client and attorney). Accordingly, we reverse the family court's decision on this issue.

## C. Award of GAL Fees in Private Custody Action

■ Last, Mother contends the family court improperly ordered her to pay $2,500 in GAL fees in the private custody action. We agree.[9]

Appointment of a GAL in a private action is controlled by the South Carolina Private Guardian Ad Litem Reform Act (the Act).[10] When the family court appoints a GAL, it must set forth the method and rate of compensation for the GAL, which includes an initial authorization of a fee based on the facts of the case. *See* § 63–3–850(A) (Supp.2010). If the GAL decides it is necessary to exceed the fee initially authorized by the family court, the GAL must provide notice to both parties and obtain the family court's written authorization or the consent of both parties to charge more than the initially authorized fee. *Id.*

Pursuant to section 63–3–810 of the South Carolina Code (2010), the family court properly appointed a GAL, Catherine Christophilis, in the private custody action. *See* § 63–3–810(A) ("In a private action before the family court in which custody or visitation of a minor child is an issue, the court may appoint a guardian ad litem...."). While Ms. Christophilis is entitled to appropriate fees for her services as a GAL as set forth in the family court's initial appointment order, the family court explicitly reserved ruling on her fees until it resolved the private custody action. When the court addressed the fee issues at the end of the intervention action, Ms. Christophilis admitted she had not filed her fee affidavit with the court. The family court then stated, "Well, your fees are associated with the private action.... Just hold your fees until the

___

9. Father did not appeal the family court's decision to require him to contribute towards the attorney's fees or the GAL fees. Thus, the family court's ruling is law of the case as it pertains to Father. *See In re Morrison,* 321 S.C. 370, 372 n. 2, 468 S.E.2d 651, 652 n. 2 (1996) (noting an unappealed ruling becomes law of the case and precludes further consideration of the issue on appeal).

10. *See* S.C.Code Ann. §§ 63–3–810 to –870 (2010).

private action." As a result, the family court took no evidence concerning Ms. Christophilis' entitlement to GAL fees. However, in its order, the family court required Mother and Father to pay a combined $5,000 in GAL fees to Ms. Christophilis, which is $2,500 greater than initially authorized pursuant to the family court's appointment order. Because the family court explicitly reserved all custody issues for the subsequent and separate phase of the proceeding, and as such, did not follow the mandates of section 63–3–850, the family court erred in awarding $2,500 in GAL fees against Mother.[11]

## CONCLUSION

Based on the foregoing, the family court's decision is **AFFIRMED IN PART AND REVERSED IN PART.**

HUFF and THOMAS, JJ., concur.

---

11. In addition, we note when the family court awarded fees to Ms. Christophilis in its order, it failed to "take into account" any of the requisite factors from section 63–3–850(B) (specifically (1) the complexity of the issues before the court; (2) the contentiousness of the litigation; (3) the time expended by the guardian; (4) the expenses reasonably incurred by the guardian; (5) the financial ability of each party to pay fees and costs; and (6) any other factors the court considered necessary). *See Loe v. Mother, Father, & Berkeley Cnty. Dep't of Soc. Servs.*, 382 S.C. 457, 473–74, 675 S.E.2d 807, 816 (Ct.App. 2009) (remanding issue of whether statutory requirements from section 63–3–850(B) were satisfied when family court improperly reviewed the reasonableness of GAL fees pursuant to *Glasscock v. Glasscock*, 304 S.C. 158, 403 S.E.2d 313 (1991)).