Ashley NOOJIN, Appellant,

v.

Frank NOOJIN, III, Respondent.

Appellate Case No. 2014–001573
Opinion No. 5423

Court of Appeals of South Carolina.

Heard February 1, 2016
Filed July 6, 2016
Rehearing Denied August 22, 2016

302

John O. McDougall, of McDougall, Self, Currence & McLeod, LLP, of Columbia, and Katherine Carruth Goode, of Winnsboro, for Appellant.

J. Mark Taylor of Moore Taylor Law Firm, P.A., of West Columbia, for Respondent.

GEATHERS, J.:

Ashley Noojin, Ph.D. (Mother) appeals the family court's order finding her in contempt and requiring her to pay Frank Noojin's, M.D. (Father) attorney's fees and costs. She argues the family court erred in (1) finding she willfully violated a court order; (2) excluding an exhibit; (3) limiting cross-examination of an expert witness; and (4) ordering her to pay Father's attorney's fees and costs and failing to award her attorney's fees and costs. We affirm.

## FACTUAL/PROCEDURAL HISTORY

Father and Mother married in 1993 and divorced on April 8, 2011. Father is a surgeon, and Mother is a licensed clinical psychologist. Two children (Son and Daughter, collectively Children) [1] were born of the marriage.

Prior to the final divorce hearing, the couple reached a child custody agreement wherein they shared joint custody, with Mother as the primary custodial parent and Father having frequent "nights of contact and visitation with the children." The agreement outlined a "phase-in" visitation schedule from December 18, 2010, until February 19, 2011, with the regular schedule to begin on March 1, 2011. The regular schedule allotted visitation every other weekend and one evening dinner on the alternate weeks. The agreement provided Children could extend (1) the weekends to include Thursday or Sunday night when Friday or Monday was a holiday and (2) the weeknight dinner to an overnight visit. The agreement outlined specific visitation schedules for holidays, birthdays, summer vacations, and spring break.

Additionally, the agreement provided:

The visitation provided to Father in this Agreement shall take into consideration each child's wishes and desires in this regard, however, the *children's wishes shall not be controlling unless otherwise specifically provided in this Agreement*.... The parties agree to engage in family counseling with a therapist mutually agreeable to the parties. They shall attend family counseling once or twice per month and Father will use his weekday time with the children for this counseling, if necessary.

(emphasis added). In addition to the visitation schedule, the agreement provided:

Each party shall exert *every reasonable* effort to maintain *free access* and *unhampered contact* between the children and each of the parties and to *foster* a feeling of *affections between the children and the other party. Neither* party shall do anything which *may estrange* the *children from the*

---

1. Daughter was born in 1998 and Son was born in 2000. They were twelve and ten, respectively, at the time of the custody agreement in 2010 and fifteen and thirteen at the time of the contempt hearing in 2013.

*other party* or *injure the children's opinion* as to his/her mother or father or which may *hamper the free and natural development* of the children's *love and respect for the other party.*

(emphases added). The parties also agreed to (1) refrain from making disparaging remarks about the other parent in the presence of Children and discourage third parties from doing so; (2) consult each other regarding Children's education, illness, health, welfare, and "other matters of similar importance affecting" Children; and (3) refrain from having physical or verbal confrontations or allowing another to do so in the presence of Children. On December 15, 2010, the family court approved the agreement and incorporated it into the final decree of divorce (the divorce order).

In February 2013, Father filed a complaint for contempt and the parties proceeded to a three-day contempt hearing.[2] At the hearing, Father testified that after the standard visitation began on March 1, 2011, he did not receive regular visits. He outlined the limited visitation he received from 2011 to 2013. Specifically, in 2011,[3] according to Father, he received one of the twenty dinners; one full weekend and four partial weekends of the twenty weekends; none of the five days allotted for spring break; one of the two days allotted for Father's Day; none of the five days allotted for Thanksgiving; and two of the ten days allotted for Christmas. In 2012, Father received one of the twenty-three dinners; two weekends of the twenty-five weekends; none of the three days for spring break; five hours of the two days allotted for Father's Day; and two days of the eight days allotted for Christmas. The contempt hearing began on April 30, 2013, and from January to April 2013, Father received one of the eight dinners, none of the eight weekends, and none of the three days allotted for spring break.[4]

---

2. The hearing took place on April 30, August 8, and September 23, 2013.

3. The majority of the visits were with Son only as Daughter ceased participating in dinner and weekend visitation in 2011.

4. We are not persuaded by Mother's argument that the family court erred in its findings of fact with respect to the amount of visitation Father actually received. Father admitted he spent time with Son on a

Following the hearing, the family court found Mother in contempt for failure to comply with the divorce order and ordered her to pay Father $41,375.84 in attorney's fees and costs. This appeal followed.

## ISSUES ON APPEAL

1.  Did the family court err in finding Mother in contempt?

2.  Did the family court err in excluding a letter Father wrote to Children on December 13, 2010?

3.  Did the family court err in limiting cross-examination of a witness?

4.  Did the family court err in awarding attorney's fees and costs?

## STANDARD OF REVIEW

■■■ "In appeals from the family court, [appellate courts] review[ ] factual and legal issues de novo." *Simmons v. Simmons*, 392 S.C. 412, 414, 709 S.E.2d 666, 667 (2011). "[W]hile retaining the authority to make our own findings of fact, we recognize the superior position of the family court judge in making credibility determinations." *Lewis v. Lewis*, 392 S.C. 381, 392, 709 S.E.2d 650, 655 (2011). "Stated differently, de novo review neither relieves an appellant of demonstrating error nor requires us to ignore the findings of the family court." *Id.* at 388–89, 709 S.E.2d at 654 (emphasis removed). Further, a finding of contempt rests within the sound discretion of the family court. *DiMarco v. DiMarco*, 393 S.C. 604, 607, 713 S.E.2d 631, 633 (2011). "Such a finding should not be disturbed on appeal unless it is unsupported by the evidence or the judge has abused his discretion." *Id.*

## LAW/ANALYSIS

### I. Willful Contempt

■■ Mother raises several grounds as to how the family court erred in its finding of contempt. We have reduced those arguments to their analytical essence.

---

few instances that were not a weekend or dinner visit. Whether Father failed to include in his visitation chart a few occasions in which he visited with Children would not change the ultimate disposition of this case.

At the outset, we note that because the family court was in a better position to assess the credibility and demeanor of the witnesses, we defer to the family court as to any alleged error regarding the specific factual findings. After observing these parties over the course of a three-day hearing, the family court was in a better position to evaluate their credibility and assign comparative weight to their testimony. *See S.C. Dep't of Soc. Servs. v. Mary C.*, 396 S.C. 15, 26, 720 S.E.2d 503, 509 (Ct. App. 2011) (holding it is proper to defer to the family court even if conflicting evidence is presented on appeal as long as ample evidence in the record supports the family court's findings and conclusions); *Pinckney v. Warren*, 344 S.C. 382, 387–88, 544 S.E.2d 620, 623 (2001) (holding the appellant carries the burden of demonstrating error in the family court's findings of fact); *Lewis*, 392 S.C. at 388–89, 709 S.E.2d at 654 (stating the appellate court generally defers to the factual findings of the family court regarding credibility because the family court is in a better position to observe the witness and his or her demeanor).

Within that framework, we find the record supports the family court finding Mother in contempt for her willful disobedience of the divorce order. "Contempt is a consequence of the willful disobedience of a court order." *Tirado v. Tirado*, 339 S.C. 649, 654, 530 S.E.2d 128, 131 (Ct. App. 2000). "A willful act is one 'done voluntarily and intentionally with the specific intent . . . to fail to do something the law requires to be done . . . .' " *Id.* (alterations by court) (quoting *Spartanburg Cty. Dep't of Soc. Servs. v. Padgett*, 296 S.C. 79, 82–83, 370 S.E.2d 872, 874 (1988)). A finding of contempt, therefore, must be reflected in a record that is "clear and specific as to the acts or conduct upon which such finding is based." *Curlee v. Howle*, 277 S.C. 377, 382, 287 S.E.2d 915, 918 (1982). "Contempt is an extreme measure; this power vested in a court is not lightly asserted." *Bigham v. Bigham*, 264 S.C. 101, 104, 212 S.E.2d 594, 596 (1975). "Prior to invoking this power, the court must necessarily consider the ability of the defendant to comply with the order." *Id.* "A party seeking a contempt finding for violation of a court order must show the order's existence and facts establishing the other party did not comply with the order." *Abate v. Abate*, 377 S.C. 548, 553, 660 S.E.2d 515, 518 (Ct. App. 2008). "Civil contempt must be shown by

clear and convincing evidence." *DiMarco*, 393 S.C. at 607, 713 S.E.2d at 633.

When considered in the aggregate, Mother's actions and her failure to act when necessary demonstrated a willful violation of the divorce order. The facts of this case are similar to *Eaddy v. Oliver*, 345 S.C. 39, 42, 545 S.E.2d 830, 832 (Ct. App. 2001), in which a father argued the family court erred in failing to find a mother in contempt for her violation of a visitation order. During the family court hearing in *Eaddy*, the father testified to ongoing problems with the mother in arranging visitation and stated there had been periods of several months when he did not see the child. *Id.* at 43, 545 S.E.2d at 832. He stated plans were made for the child without his knowledge and the child went on other social outings instead of visiting him as provided in the order. *Id.* The father testified regarding the mother's refusal to cooperate or keep him informed about the child. *Id.* at 43, 545 S.E.2d at 833. He stated he had made several attempts to discuss his lack of visitation with the mother but the mother "responded by telling him [the child] did not want to see him, hanging up the phone, and refusing to answer letters from his attorney." *Id.* This court held the family court erred in failing to hold the mother in contempt because the father's testimony constituted a prima facie showing of contempt and the mother did not produce evidence tending to establish a defense or explanation for failing to comply with the family court order. *Id.* "Once the movant makes a prima facie showing by pleading an order and demonstrating noncompliance, 'the burden shifts to the respondent to establish his defense and inability to comply.' " *Id.* at 42, 545 S.E.2d at 832 (quoting *Henderson v. Henderson*, 298 S.C. 190, 197, 379 S.E.2d 125, 129 (1989)).

Here, Mother asserts her failure to comply with the divorce order resulted from Father's agreement to not require Children to visit him against their wishes. She argues she did not introduce the concept of "forced visitation," as the family court found; however, if she did, that concept was adhered to by Father and the family's therapist. Therefore, according to Mother, her "alteration of the visitation schedule" was not done with bad purpose and was not a willful disobedience of the court order. We disagree.

Part of Mother's contemptuous behavior centers on her introduction and implementation of the concept of "forced" visitation as a negative notion, failure to facilitate visitation, and acquiescence in Children's refusal to participate in visitation. For a proper understanding of this case, an extensive presentation of the facts is necessary. Although the record includes a large volume of email exchanges between Mother and Father, a few particularly poignant exchanges are addressed below.

For example, on December 15, 2010—the day the family court approved the custody agreement—Mother emailed Father, stating in pertinent part:

pushing [Children] beyond where they feel comfortable will do damage and hurt all of you in the long run[.] I know we set a schedule but this is your chance to show them the kind of dad that you want to be. Let them ask you for more time. ... They do not want a schedule even though you do. ... *My allegiance is with them and only with you as well if you listen to them.*

(emphasis added). On March 15, 2011, after requests from Father for visitation, Mother wrote Father, explaining "*I will never support forcing time with you against their will.* If you make that choice, *you are on your own. I was offering my help if you were willing to listen to their thoughts and feelings.*" (emphases added). On March 27, 2011, Mother sent Father a lengthy email detailing her tumultuous relationship with her own father that developed after she was "forced" to visit with him following her parents' divorce. She explained she told Children about the pain the visitations caused and they asked "will [Father] do to us what your dad did to you." She stated she "assured them that [Father] would never do the things to them that" her father did to her, i.e., require Children to visit him against their wishes.

In August 2011, Mother wrote Father scolding him for calling Daughter to ask her about her eighth-grade speech, stating Daughter was "very upset" by the call and she "needs to be prepared" if Father is going to contact her. On September 5, 2011, Mother wrote Father stating she encouraged Son to see Father; however, "*The only thing [she did] not do is force him. ... Forcing him is not the answer.*" (emphasis

added). On May 8, 2012, apparently irritated with Mother, Father wrote an email expressing his frustration that two years had passed in which Children had minimal contact with Father. Father stated the following:

It seems that the visitation part of the agreement is ignored .... [Y]ou either do not tell me about school functions or dismiss me from them when you don't want me there. ... [Y]ou never answer the phone and you do not have the kids return them. ... I can't believe you allow your daughter to have a cell phone block so her own father who loves her and cannot communicate with her. ... You rarely inform me of anything going on with my daughter. I have to find out from other people what my children are doing. ... As their mother[,] you control most of what they do and who they associate with and, after informing them that their father was seeking "forced" visitation, informed them that that was wrong and that it didn't work for you. You overly interjected your own personal experience into my relationship with my kids! Now, knowing their father is optional.

On May 23, 2012, after Father requested to schedule visitations with Son, Mother wrote Father stating *Son did not want Mother* to plan a visitation schedule for him, explaining Son was busy with "huge tests" and "he will be ready to have some conversations about the summer once school gets out." Father asked Mother to assist Son in creating a schedule "since he's only 12," but Mother responded, "If he wanted me to help him plan, I would be happy to."

In emails exchanged between August 20 and 30, 2013—after the second day of the three-day contempt hearing—Mother expressed her concern with Father's request for dinner with the children; however, she stated she would "comply with the court orders and [Father's] request." Nevertheless, in additional emails, she skirted visitation requests. Further, she stated, "You [do not] seem to even care what your plan is doing to them." Father responded as follows:

Of course I am concerned. Maybe you should consider allaying their fears about time with their Dad. Did you ever consider that I might have something to contribute to their emotional development, their future relationships, their education, and more? ... Ostracizing and alienating me (and

having the children participate in this with your approval) is not allowing any of us to heal.

A few days later, in September 2013, in an attempt to thwart another visitation request, Mother stated, "As you are well aware, the court-approved agreement provided that visitation takes into account the children['s] wishes and should include therapy." [5] She went on to state Children were "distraught" and would run away if "forced to visit with" Father.

In addition to these emails, Jennifer Savitz–Smith, the family's therapist and an expert in counseling children and family counseling, testified that although Mother and Children used the term "forced" visitation, the term was not a part of her lexicon and Father did not introduce the term to her. Moreover, when asked her expert opinion regarding Mother's emails and behaviors, Allison Foster, Ph.D., an expert in clinical psychology, testified she would be concerned about Mother's "circumnavigation" of the court order.

Accordingly, we find the record reveals Mother's unwillingness to comply with the court order from the day the family court approved the custody agreement. *See Tirado*, 339 S.C. at

---

5. Despite Mother's argument on appeal, as we read the plain language of the agreement, Father's visitation rights were not contingent upon Children's wishes *or* the family attending therapy. *See Bogan v. Bogan*, 298 S.C. 139, 142, 378 S.E.2d 606, 608 (Ct. App. 1989) ("The language used in a decree must be given its ordinary and commonly accepted meaning."); *id.* ("Where an instrument evidences care in its preparation, it will be presumed its words were employed deliberately and with intention."); *see also Hawkins v. Mullins*, 359 S.C. 497, 503, 597 S.E.2d 897, 900 (Ct. App. 2004) (reversing the family court's failure to find a mother in contempt for failing to produce the child for summer visitation, finding the mother's claims regarding misunderstanding the family court's orders were "disingenuous" and the mother had a history of interfering with the father's visitations); *cf. Ward v. Washington*, 406 S.C. 249, 255, 750 S.E.2d 105, 109 (Ct. App. 2013) (holding evidence supported finding Mother could have reasonably misinterpreted the order; therefore, her actions of withholding visitation were not willful). Moreover, as to any alleged inconsistencies in the remedial provisions of the contempt order, there can be little doubt that the family court did not intend for future therapy to be used as a precondition or tool to prohibit Father's visitation with either child. The family court explicitly stated: "this family needs therapy with ... whomever can be agreed upon. However, I *specifically find* that such therapy shall *not be used as a tool or pre-condition* to prohibit Plaintiff–Father from the regular parenting time and contact with the children afforded him under the terms of the court-approved Custody Agreement." (emphasis added).

654, 530 S.E.2d at 131 ("Contempt is a consequence of the willful disobedience of a court order."). The evidence demonstrates Mother coined the term "forced visitation," alienated Father by imparting to Children scheduling visitation was inappropriate, refused to set a schedule, and sought Children's guidance any time Father sought to enforce the custody agreement. Not only did Mother fail to require Children to visit with Father, she imparted to Children the idea that they *did not have to* visit with Father if they did not want to. We find Mother's actions in this regard constituted a willful disobedience of the divorce order. *See Watson v. Poole*, 329 S.C. 232, 239, 495 S.E.2d 236, 240 (Ct. App. 1997) (affirming a change in custody to a father when "Mother has exhibited an unwillingness to facilitate the child's visitation with Father").

We recognize Father initially yielded to Children's wishes and allowed for more flexibility in deciding when to visit with him. However, as the email exchanges demonstrate, Mother continued to refuse or thwart visitation efforts even after Father sought to enforce the agreement because weeks would pass without him seeing Children. The email exchanges directly contradict Mother's testimony that she was unaware Father sought the visitation allotted in the order. Moreover, Mother continued these actions after the contempt hearing began. *See Schadel v. Schadel*, 268 S.C. 50, 57, 232 S.E.2d 17, 20 (1977) (holding the family court erred in failing to hold a mother in contempt after she "refused visitation" of the father with their children in contravention of family court orders).

We find the instant case is distinguishable from *Nash v. Byrd*, 298 S.C. 530, 534–35, 381 S.E.2d 913, 915–16 (Ct. App. 1989), in which this court affirmed the family court's declination to hold a mother in contempt. In *Nash*, the mother would not force a child to visit his father after she would prepare the child for visitation, but the child would refuse to get in the car with the father. *Id.* This court observed the child suffered severe physical and emotional problems as a result of the visits, the visitation problems were caused by the father's conduct, and the mother took all reasonable steps to resolve the problems. *Id.* Here, the record is devoid of evidence demonstrating Children suffered any psychological disorders or physical harm as a result of visiting with Father or the visitation problems were caused by Father. In fact, during

oral arguments, this court specifically asked Mother whether visitation with Father caused Children any psychological or physical harm, which Mother unequivocally denied. Rather, Mother did not require Children to visit with Father because *Children did not want to* and Mother disagreed with the notion of scheduling visitation.

Our jurisprudence has little case law addressing this issue— holding a custodial parent in contempt for his or her refusal to require minor children to visit the noncustodial parent against the children's wishes—however, in the absence of psychological or physical harm, most jurisdictions would support finding the behavior Mother displayed was willful disobedience and constituted contempt.[6] *See Schotz v. Oliver*, 361 So.2d 605, 606 (Ala. Civ. App. 1978) (affirming a finding of contempt when a mother "informed the court that she was not willing to force the unwilling child to visit with respondent as directed by the court. Nor [was] she willing to forcibly remove the child from the car in order to deliver custody to respondent. If the child were willing to visit respondent, [the mother] says she would comply with the order by delivering the child to the designated location"); *Clark v. Atkins*, 489 N.E.2d 90, 97 (Ind. Ct. App. 1986) (affirming a finding of contempt when a mother did not require the children to visit with their father, rejecting the contemptuous mother's argument that her minor children's refusal to visit their father justified her noncompliance with a visitation order); *Pratt v. Spaulding*, 822 A.2d 1183, 1187 (Me. 2003) (affirming a finding of contempt when the mother "explicitly refused [the father]'s request for contact with his son on two days when such contact was required by court order. Subsequently, by not answering her phone, by refusing to return calls, and by having her phone disconnected, she rendered the child unavailable for contact with [the father] for approximately two months, until he brought the contempt motion"); *Casbergue v. Casbergue*, 124 Mich.App. 491, 335 N.W.2d 16, 18 (1983) ("[The mother] testified that she told her daughters that they were required to visit their father by the

---

6. *See Rice v. Rice*, 335 S.C. 449, 456–64, 517 S.E.2d 220, 224–28 (Ct. App. 1999) (surveying case law from other jurisdictions because South Carolina case law provided "little guidance" as to how a court should decide a specific custody issue and relying on case law from varying jurisdictions to support its holding).

visitation order but that she did not impose any discipline to make it clear that she expected the children to comply with the order. We hold that the trial court did not err ... in finding [the mother] guilty of contempt for violation of the order."); *In re Marriage of Marez & Marshall*, 377 Mont. 304, 340 P.3d 520, 527 (2014) ("[W]here a parent fails to make reasonable efforts to require a recalcitrant child to attend visitation as provided for in a parenting plan, the parent has not made a good faith effort to comply with the parenting plan, and a contempt order may be appropriate."); *Smith v. Smith*, 70 Ohio App.2d 87, 434 N.E.2d 749, 752 (1980) (affirming the trial court's finding the custodial parent in contempt for failing to abide by a visitation order, holding the custodial parent interfered with the noncustodial parent's visitation rights by using "the children's reluctance to visit [the noncustodial parent] as an excuse to thwart [that parent]'s right of visitation"); *id.* ("In the absence of proof showing that visitation with the defendant would cause physical or mental harm to the children or a showing of some justification for preventing visitation, *the plaintiff must do more than merely encourage the minor children to visit the defendant.*" (emphasis added)).

The above-cited approach of various jurisdictions is consistent with our state's policy to ensure minor children of divorce are not estranged from the noncustodial parent. *See McGregor v. McGregor*, 255 S.C. 179, 183, 177 S.E.2d 599, 600 (1970) ("The general rule is that minor children, notwithstanding the divorce, are entitled to the love and companionship of both parents, and the well[-]rounded development of a normal child demands an association with both parents."). Therefore, we find the above-cited cases instructive, but limit our holding in this regard to the facts presented and do not suggest that in every situation in which a custodial parent fails to force a child to visit a noncustodial parent, such custodial parent should be held in contempt. A contempt finding is determined on a case-by-case basis. The finding was appropriate here because not only did Mother coin the negative term "forced visitation," she emboldened Children in their refusal to visit Father, alienated Father by imparting to Children scheduling visitation was inappropriate, and refused to facilitate visitation or set a schedule.

In any event, notwithstanding Mother's failure to "force" or facilitate visitation by requiring visitation against Children's wishes, Mother's additional actions support a finding of contempt. Mother argues she did not interfere with or fail to promote Father's relationship with Children, and she did not disparage Father or encourage disparagement of Father by Children. Further, she argues the family court erred in finding she failed to exert every reasonable effort to maintain free access and unhampered contact between Children and Father as required by the court order. We disagree. Mother nonchalantly admitted she allowed Son to block Father's phone number from his cell phone without providing any consequences.[7] Further, Father testified—and the emails indicate—his calls to Mother, Children, and the family home went unanswered or unreturned.[8] Additionally, Mother admitted she allowed Children to disinvite Father from social or school events and she either did not inform Father of Children's school events or asked Father to leave events he attended; and, she made Children aware of her requests that he leave.

Furthermore, we find Mother's actions and her failure to administer any consequences for Children's behavior toward Father estranged Children from Father, encouraged disparagement of Father, and injured Children's opinion of Father in violation of the divorce order. Mother admitted that during a January 11, 2013 instance—the exchange that ultimately led to Father finally filing the instant contempt action—when Mother met Father with Children, Children refused to get out of the car, asserting Father would have to "drag them out of

---

7. Daughter blocked Father's phone number from her cell phone one month before the divorce order. However, Son blocked Father's number over a year after visitation began. Mother admitted both blocks only lasted three months and Children reinitiated the blocks each time they expired.

8. Mother's arguments on appeal are contradictory in that on one hand, she argues the cell phone blocks did not prevent Father's communication with Children "because he could reach them by email and the house telephone." Yet, on the other hand, she notes, "With respect to the claim of unanswered calls on the house phone, Father acknowledged that the only land line in the house could not be heard throughout the entire house or from outside." Given Father's voicemails on the landline were unreturned, Mother's logic would leave Father to communicate with *minor* children by email only.

the car"; and stating, "Are [you] going to use your manly muscles to make me or something" and "we're not going with you, you moron." Mother admitted she should have corrected Children's behavior in the moment but she did not. Mother testified, she "was quiet for a moment. [Then she] said to [Father], ... [']This is between the two of you. This is between you and the children. Talk to them and explain.' " We find Mother's inaction in this regard and her passive acquiescence of Children disparaging Father was a willful violation of the court order.[9]

Moreover, Mother, a licensed clinical psychologist, did not foster "a feeling of affections" between Children and Father as required by court order; instead, the evidence supports the family court finding Mother hampered the free and natural development of Children's love and respect for Father. The record is replete with evidence showing Mother hovered over Children's every move and interaction with Father, perpetuated the idea of alienation, and supported their emotional distance from Father. In one example among many, Mother interfered with Father's attempt to build a relationship with Children after he invited Children's friends to a visitation dinner. Mother called some of the friends and canceled the dinner arrangements. Mother admitted that when Father would not disclose all of the invited friends, she told Father, " 'Please don't make me call all of their friends to try to find out who it is [Father invited to the dinner]. I just don't—the children don't want their friends there.' " She further testified,

---

9. *See Commonwealth ex rel. Ermel v. Ermel*, 322 Pa.Super. 400, 469 A.2d 682, 684 (1983) (affirming a finding of contempt when a father pleaded with the mother "to assist him by talking to the child or helping him get her to the car [for visitation], but [the mother] said nothing and looked at the ceiling"); *Rideout v. Rideout*, 110 Wash.App. 370, 40 P.3d 1192, 1197 (2002) (noting "[m]ost importantly" in its finding of contempt against a mother that the mother improperly maintained any dispute about the child's visitation with the father was between the child and the father), *aff'd, In re Marriage of Rideout*, 150 Wash.2d 337, 77 P.3d 1174 (2003); *id.* ("[The mother] *wants to cast herself in the role of a bystander* without the power or right to require that [the child] follow the parenting plan. But the *law imposes a greater responsibility* on [the mother]. She, not [the child], bears the primary responsibility to ensure that [the child] visit with her father according to the parenting plan. And *she must, in good faith, make every effort to require* [the child] to do so." (emphases added)).

"Their dad has never asked them if they wanted their friends there. So they were re[al]ly upset by that. That's why I did what I did. If the children had[ ] wanted their friends, I wouldn't have even [ ] gotten involved; but it was going to be a surprise for them, and they were very upset." Mother's behavior in this regard was a violation of the court order. *See* Roy T. Stuckey, *Marital Litigation in South Carolina*, 581 (4th ed. 2010) (noting South Carolina case law holds the "custodial parent should not have unfettered freedom to control all aspects of visitation with the noncustodial parent").

Dr. Foster, an expert in clinical psychology, opined Mother's communications and behaviors (1) indicated a strategy to block and thwart visitation as agreed to; (2) suggested a passive-aggressive approach to sabotage visitations; (3) undermined Father; and (4) demonstrated Mother, as the controlling agent, encouraging Children to campaign against Father. Further, Dr. Foster opined Mother's behavior created a "loyalty bind" for Children, in which they could not simultaneously enjoy both parents. Mother's behavior "triangulat[ed] the children, creating an alignment between one parent and the children, and creating toxic circumstances to increase the likelihood that they will reject the other parent." Dr. Foster was concerned about whether Mother had any "investment in being a good-faith gatekeeper of the relationship between the father and the children." Moreover, Dr. Foster opined Mother was unsupportive of Father and created an age-inappropriate toxic dynamic by empowering Children and placing them in the middle of the conflict.

Dr. Foster admitted Father's act of initially leaving the issue of visitation to Children gave Children too much authority and power and sent mixed messages. However, she opined this issue was Mother's fault and Father was not at fault because:

> [H]e's the rejected and estranged parent, and he's the one who's being denied access. She's the gatekeeper. She's been entrusted by the Court with that position as primary custodial parent, and it's my observation that this was a father who was making a wide range of attempts to honor the wishes of his children and his ex-wife and still seek access and visitation.

Based on the foregoing, and mindful that contempt is an extreme measure, we affirm as Mother has failed to persuade us that the family court's contempt finding was not supported by the evidence. *See Hawkins v. Mullins*, 359 S.C. 497, 501, 597 S.E.2d 897, 899 (Ct. App. 2004) ("Before a party may be found in contempt, the record must clearly and specifically show the contemptuous conduct."); *id.* ("On appeal, the appellate court may reverse a [family court]'s determination regarding contempt only if it is without evidentiary support or is an abuse of discretion.").

Father's initial attempts to appease Children by informally agreeing to a flexible visitation schedule and abide by their wishes did not change the fact that he had a court-ordered right to a specific amount of visitation. *See Miles v. Miles*, 355 S.C. 511, 519, 586 S.E.2d 136, 140 (Ct. App. 2003) ("It is axiomatic that parties cannot modify a court order."). Moreover, the record suggests Father's initial flexibility was an attempt to maintain a relationship with Children in the midst of Mother imparting to Children her problems with being "forced" to visit with her own father and Mother's unwillingness to require Children to abide by a visitation schedule as mandated by the court order. The record supports the family court finding Father "in good faith intended to placate and ease tensions in order to proceed toward implementation of his court-ordered parenting time." Accordingly, a finding of contempt was appropriate because Father's attempts to exercise his rights were improperly and willfully frustrated by Mother's actions and inactions. *See Hawkins*, 359 S.C. at 503, 597 S.E.2d at 900 (reversing the family court's failure to find a mother in contempt for failing to produce the child for summer visitation).[10]

---

**10.** Because we find this issue is dispositive, we decline to reach Mother's arguments regarding admitting evidence and limiting cross-examination. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (noting an appellate court need not address remaining issues on appeal when the resolution of a prior issue is dispositive). Moreover, our decision on those two issues would not change the ultimate disposition of this case. *See Weir v. Citicorp Nat. Servs., Inc.*, 312 S.C. 511, 517, 435 S.E.2d 864, 868 (1993) (holding the exclusion of cumulative evidence was not prejudicial error); *Recco Tape and Label Co. v. Barfield*, 312 S.C. 214, 216, 439 S.E.2d 838, 840 (1994)

▌

## II. Attorney's Fees and Costs

▌ Because we affirm the family court's overall contempt findings, we also affirm the award of attorney's fees and costs. Regardless of whether the family court applied the *E.D.M.* factors or compensatory contempt doctrine,[11] the family court correctly determined Father was entitled to attorney's fees. Mother has a gross *monthly* income of $23,451, including her salary, alimony, and child support. She has over $5 million in savings. Mother's payment of the attorney's fees and costs would not affect her standard of living in any meaningful way. Accordingly, we affirm the award of attorney's fees. *See Whetstone v. Whetstone*, 309 S.C. 227, 235, 420 S.E.2d 877, 881 (Ct. App. 1992) (holding the family court properly awarded a wife attorney's fees incurred as the result of her husband's contempt).

## CONCLUSION

Based on the foregoing, we affirm the family court's order in its entirety.

**AFFIRMED.**

HUFF and KONDUROS, JJ., concur.

▌

---

(holding to warrant reversal, the appellant "must show both the error of the ruling and resulting prejudice").

11. *See Miller v. Miller*, 375 S.C. 443, 463, 652 S.E.2d 754, 764 (Ct. App. 2007) ("Courts, by exercising their contempt power, can award attorney's fees under a compensatory contempt theory."); *id.* ("Compensatory contempt seeks to reimburse the party for the costs it incurs in forcing the non-complying party to obey the court's orders."); *E.D.M. v. T.A.M.*, 307 S.C. 471, 415 S.E.2d 812 (1992) (stating that when determining whether an attorney's fee should be awarded, the following factors should be considered: "(1) the party's ability to pay his/her own attorney's fee; (2) beneficial results obtained by the attorney; (3) the parties' respective financial conditions; and (4) effect of the attorney's fee on each party's standard of living").