2201

STATE of South Carolina, Respondent v. Joseph J. BEVILACQUA, Ph.D., Commissioner of the State Department of Mental Health, Appellant. In the Interest of: DOUGLAS F., a minor under 17 years of age.

(447 S.E. (2d) 213)

Court of Appeals

*Kennerly M. McLendon, South Carolina Dept. of Mental Health,* Columbia, *for appellant.*

*Asst. Sol. John W. DeJong,* Greenville, *for respondent.*

Heard May 10, 1994.

Decided July 5, 1994. ▌

*Per Curiam:*

This is a contempt action for failure to comply with a family court order requiring the admission of a minor for psychiatric treatment to a hospital operated by the South Carolina Department of Mental Health (the Department). The named defendant is the Commissioner of the Department of Mental Health in his official capacity as Commissioner. The family court held the Commissioner in contempt for the Department's failure to comply with its admission order and imposed a fine, but suspended the fine on several conditions. The Commissioner does not challenge the conditional suspension of the fine, and we express no opinion on this matter. The only question on appeal is whether the family court abused its discretion in finding the Commissioner in contempt.[1] We reverse.

The Department makes two basic arguments on appeal. First, it argues there is no evidentiary support for several specific findings of fact by the trial judge or his general finding that the Department intentionally and wilfully disobeyed the court's order. Rather, it argues, the delay in complying with the court's order was the result of miscommunication between the Department's Assistant General Counsel and other employees. The Department also argues the trial judge abused his discretion by considering matters outside the record, i.e., the apparently long-standing disagreement between the family court and the Department over commitment procedures and the Department's past refusals to obey family court commitment orders, thereby demonstrating a "predisposition" to find the Department in contempt based on past problems rather than the specific facts in this case.

The principal facts are undisputed. The Department admitted and stipulated to the accuracy of the facts alleged in the complaint for contempt. The Department further stipulated

---

[1] The family court dismissed the personal contempt action against the Commissioner and, therefore, we hereinafter refer to the defendant as the Department. The only evidence is that the Commissioner had no prior personal knowledge of this case, and he ordered compliance with the court order immediately upon learning of the problems. Nevertheless, he candidly admitted that the "buck stops" with him.

that the complaint "established a prima facie case as to the State's case on the Rule to Show Cause."[2]

Essentially the facts are as follows. The sixteen year old juvenile Douglas F., who had been charged with having committed several offenses and was being detained in the county jail, was brought before the family court for a forty-eight-hour detention hearing on February 11, 1993. At the hearing the family court ordered an evaluation of Douglas by the Greenville Mental Health Center, a local unit of the State Department of Mental Health. The Mental Health Center performed the evaluation and forwarded reports to the court on February 23, 1993. The report recommended "Douglas should be committed to the State Hospital system for the treatment of depression, suicidal behavior, substance abuse, and possible thought disorder." Douglas was brought back before the court on February 25, 1993 at which time the State moved to commit him to the William S. Hall Psychiatric Hospital. Counsel for Douglas joined in the motion. On March 10, 1993, the family court committed Douglas to William S. Hall Psychiatric Hospital pursuant to S.C. Code Ann. § 44-24-150 (1976).[3] The commitment order required the Greenville County Sheriff to transport Douglas to the hospital within forty-eight hours.

After receipt of a copy of the order on March 11, 1993, Mark Binkley, Esq., counsel for the Department, talked with Mr. Lancaster, a counselor with the Greenville Mental Health Center and advised him that Douglas would have to be admitted but agreed that he would recommend to the Assistant Solicitor and court that Douglas be committed to the Patrick B. Harris Psychiatric Hospital, in Anderson, South Carolina instead of William S. Hall. The principal reason for the change appears to have been for the convenience of Douglas' family. The Assistant Solicitor agreed to the change subject to the approval of the court.

At this time Binkley noted a deficiency in the March 10th order and mentioned to the Assistant Solicitor that he was ad-

---

[2]This stipulation probably resulted from a misunderstanding of who bore the burden of proof in this case.

[3]Contrary to the court's contempt order, the March 10th order refers only to § 44-24-150 (1976). The court could not therefore bootstrap its authority under § 20-7-1330(c) to hold the Department in contempt. We expressly make no ruling as to whether the family court sufficiently complied with § 44-24-150.

vising the Mental Health Center to prepare an application for emergency admission of Douglas under the provisions of S.C. Code Ann. § 44-24-60 (1976). After instructing Lancaster to prepare the application for emergency admission, Binkley left it up to Lancaster to coordinate the matter with the Solicitor's Office. On March 12, 1993, Lancaster notified the Assistant Solicitor of the progress of the emergency commitment proceedings but assured him the juvenile would be admitted that day.[4] The same day, pursuant to the request of the Greenville Mental Health Center, the Assistant Solicitor prepared and the court signed an order requiring the Sheriff to transport Douglas to a child and adolescence center for another psychiatric evaluation designed to fulfill the requirements of § 44-24-60. The psychiatrist, performing this second evaluation, determined Douglas did not meet the requirements for emergency admission and someone from the Mental Health Center called the Assistant Solicitor late in the afternoon on Friday, March 12th to advise him Douglas was "not committable." Neither the psychiatrist nor anyone from the Center advised Binkley or the Commissioner of this decision.

Late in the afternoon of March 15th Binkley called the Harris Hospital on another matter and happened to inquire if Douglas had been admitted and learned that he had not. The next morning after an investigation, Binkley discovered what had transpired and called the Assistant Solicitor, whereupon he learned a contempt rule was being prepared. Binkley explained to the Assistant Solicitor what he termed a miscommunication in the Department, asked the rule be discontinued and assured the Assistant Solicitor that Douglas would be admitted to the hospital immediately without an emergency admission. After the Assistant Solicitor talked with the court, Binkley was advised the court would modify its order to permit Douglas to be committed to Harris Hospital instead of William S. Hall; however, because of what had transpired, the contempt proceeding would continue. An order was signed admitting Douglas to Harris Hospital instead of William S. Hall and Douglas was transported to the hospital the next day. At

---

[4]Contrary to the State's argument, the family court order did not specifically order the admission of Douglas to the state hospital on March 12, 1993. The order simply ordered the Sheriff to transport Douglas to the state hospital within 48 hours.

the request of Binkley, the juvenile also signed voluntary commitment papers.

At the contempt hearing Binkley testified it was always his intention and the intention of the Department that Douglas be admitted to one of its facilities. He testified that his sole reason for advising personnel of the Greenville Mental Health Center to pursue an emergency admission was to bolster the Department's authority to admit Douglas, not to disregard the court's order. He stated that on March 11th he advised the Greenville Mental Health Center that Douglas would have to be admitted and fully expected that there would be no problem in obtaining an emergency admission in view of the fact the Department's own psychiatrists had recommended the admission. He further stated he "didn't anticipate that an emergency admission would cause any delay beyond what it would take to get a physician to evaluate the child."[5] He further testified that he was surprised to learn on Monday, March 15th that Douglas had not been admitted. He also stated that his primary concern about the March 10th order was that it did not commit Douglas to the hospital utilizing "the procedures and forms applicable to the probate court" as mandated by § 44-24-150.[6]

In holding the Department in contempt, the trial court was outraged by the Department questioning the validity of its order and electing to proceed in the probate court on an emergency basis. In explaining why he did not bring his concerns to the family court and seek clarification of the order, but sought instead a supplemental probate court admission, Binkley stated:

---

[5]We note that this entire situation may have been averted if the psychiatrist who first evaluated Douglas (and who Binkley had arranged to do the second evaluation) had been available to conduct the second evaluation or if the Mental Health Center had called Binkley after evaluating Douglas on March 12th.

[6]Section 4-24-150(C) provides:

> If a psychiatric evaluation indicates a child is in need of judicial admission, the family court may:
> (1) defer to the probate court for purposes of commitment to a range of services; or
> (2) commit to a range of services utilizing the procedures and forms applicable to the probate court pursuant to Chapter 23 and Sections 44-24-90 through 44-24-140.

I thought that the delay that would be occasioned by having discussions with the Court or the Solicitor's office and getting the forms into the hands—or sending copies of the forms to the Court would all be obviated or avoided by merely talking to the Mental Health Center, which had the forms on file, which had physicians available, and I thought—wrongly, as it turned out—but. I thought at the time that it would be a simple matter to get the child upon commitment papers together with the Family Court's order, and we'd have—between the two of them we'd have compliance with § 44-24-150.

We view the principal issue in this appeal as presenting the fundamental question of whether the Department's response to the family court order was a deliberate avoidance of the order's mandates even though the Department may have perceived the order as informed. From our review of the record, particularly the testimony of Binkley, it is apparent that the Department considers itself a "watchdog" of sorts to ensure the family court follows proper commitment procedures. While the Department has the responsibility for ensuring it has proper legal authority for admitting patients to its facilities, the courts, not the Department, are the final determinates of the sufficiency of that authority. If the Department believed there was a problem with the instant order, wise counsel would have dictated it should, through appropriate intervention, sought relief from the family or an appellate court. Courts have no. more important function to perform in the administration of justice than to ensure their orders are obeyed. The appellate courts of this state have zealously defended the right of trial courts to vindicate their authority by way of contempt. Nevertheless, contempt is an extreme measure and the power to adjudge a person in contempt is not to be lightly asserted. *State v. Harper*, 297 S.C. 257, 258, 376 S.E. (2d) 272 (1989).

In deciding this appeal, we must first determine whether the contempt involved in this case was civil or criminal. Where the primary purpose of the proceedings is to preserve the court's authority and to punish for disobedience of its orders, the contempt is generally considered criminal. *Checker Yellow Cab Co., Inc. v. Checker Cab & Parcel Service, Inc.*, 287 S.C. 608, 340 S.E. (2d) 549 (Ct. App.

1986); 17 Am. Jur. (2d) *Contempt* § 8 (1990). On the other hand, where the purpose of the proceeding is to coerce obedience to a court order, the contempt is civil. *Checker Cab Co., supra.* Here there was no likelihood that Douglas would not be admitted to Harris Hospital when the Rule To Show Cause order was issued. The stated purpose of the court instructing the Assistant Solicitor to proceed with the Rule To Show Cause was because of what had "transpired," not because there was any concern the Department would not admit Douglas. Thus, the primary purpose of the Rule To Show Cause was to punish the Department for disobedience of the March 10th order and to vindicate the court's authority. We therefore conclude the instant proceeding was in the nature of a criminal contempt proceeding. *Dyer v. Dyer*, 213 N.C. 634, 635, 197 S.E. 157, 158 (1988) ("criminal contempt is a form applied where the judgment is in punishment of an act, already accomplished, tending to interfere with the administration of justice").

A determination of contempt ordinarily resides in the sound discretion of the trial judge. *Whetstone v. Whetstone*, 309 S.C. 227, 420 S.E. (2d) 877 (Ct. App. 1992). It is well settled that contempt results from willful disobedience of a court order; and before a person may be held in contempt, the record must be clear and specific as to acts or conduct upon which the contempt is based. *Harper*, 376 S.E. (2d) at 274; *Spartanburg County Dep't of Social Services v. Padgett*, 296 S.C. 79, 370 S.E. (2d) 872 (1988); *Curlee v. Howle*, 277 S.C. 377, 287 S.E. (2d) 915 (1982). A willful act is defined as one "done voluntarily and intentionally with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say with bad purpose either to disobey or disregard the law." *Padgett*, 370 S.E. (2d) at 874. Intent for purposes of criminal contempt is subjective, not objective, and must necessarily be ascertained from all of the acts, words and circumstances surrounding the occurrence. *State v. Bowers*, 270 S.C. 124, 241 S.E. (2d) 409 (1978); *Jackson v. Jackson*, 241 S.C. 1, 126 S.E. (2d) 855 (1962); 17 Am. Jur. (2d) *Contempt* § 36 (1990).

Although, the Department may have used poor judgment in the manner in which it pursued the emergency commitment procedure resulting in a delay in Douglas'

commitment to a Department facility, we conclude the record does not demonstrate willful disobeyance, especially in the context of this criminal contempt proceeding. *See State ex rel. Love v. Howell*, 285 S.C. 53, 328 S.E. (2d) 77 (1985). Willfulness or intent is an essential element of a criminal contempt. *State v. Weinberg*, 229 S.C. 286, 92 S.E. (2d) 842 (1956); *State v. Johnson*, 249 S.C. 1, 152 S.E. (2d) 669 (1967); 17 Am. Jur. (2d) *Contempt* § 34 (1990). In a criminal contempt, the State carries the burden of proving the guilt of the defendant beyond a reasonable doubt. *State v. Weinberg, supra; State v. Johnson, supra.* Here the trial judge sat as the trier of the facts. Where there is sufficient evidence worthy of belief, this court will not disturb those findings. *State v. Bowers*, 270 S.C. 124, 241 S.E. (2d) 409 (1978). We conclude the facts of this case, however, are insufficient to demonstrate the Department entertained a willful intent to disobey the order of the family court, thus, interfering with the administration of justice.

As to the court's improper consideration of the pre-existing disagreement between the family court and the Department on commitment procedures, it is evident from the record that the disagreement impacted upon the court's decision to hold the Department in contempt. Excerpts from the court's statement to Dr. Bevilacqua illustrate this point:

> And you've [Bevilacqua] heard me express, time and time again, the greatest frustration of the Family Court is the Department of Mental Health refusing to accept for admission juveniles—children—that we sent, time, and time, and time again.
>
> \* \* \* \* \* \*
>
> I'm not frustrated by any law, nor is any other Family Court Judge. We're frustrated by the Department of Mental Health, telling us who they're going to treat—who qualifies. All of the Department of Mental Health employees ignore Court Orders until they get an okay from counsel. The Department does not appreciate any issues of the Family Court. The Department is going to do what the counsel and the Commissioner says they're going to do. There's no need for any court. The last time I read the law, Court Order said you must be obeyed—not we'll decide, or we'll qualify, or we'll get some other forms in. The contemptuous conduct in this case was more outrageous because I followed exactly the procedures that the Mental Health said they wanted fol-

lowed, after all of these years, ignoring the law of 20-7-1330, which has given the Court the authority to commit for treatment to any agency in this State—unqualified. Unqualified. That's the law. Until the Legislature in this State or the State Supreme Court tells me and the rest of these Family Court Judges that we don't have any authority, today the Commissioner is advised that we are the authority.

The trial judge's frustration and anger,[7] as demonstrated in the record, over past disagreements with the Department necessarily provided a predisposition to hold the Department in contempt. This provides an additional basis for reversing the contempt.

Reversed.

---

[7]After a recess the court stated:

The record will reflect that the Court took a recess in the middle of cross-examination to renew its patience and express its uncontrollable anger outside of the courtroom.