# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Richard J. Hook, Respondent,

v.

South Carolina Department of Health and Environmental Control and Phillip Patterson,

Of Which South Carolina Department of Health and Environmental Control is the Appellant and Phillip Patterson is the Respondent.

Appellate Case No. 2019-001282

---

Appeal From The Administrative Law Court
S. Phillip Lenski, Administrative Law Judge

---

Opinion No. 5973
Heard June 16, 2022 – Filed March 15, 2023

---

**REVERSED**

---

Bradley David Churdar, of Charleston, for Appellant.

Mary Duncan Shahid and Angelica M. Colwell, both of Nexsen Pruet, LLC, of Charleston, for Respondent Richard J. Hook.

Phillip Patterson, of Charleston, pro se.

---

**KONDUROS, J.:** The South Carolina Department of Health and Environmental Control (DHEC) appeals the administrative law court (ALC) holding it in contempt

for failing to comply with a consent order.  DHEC contends the ALC erred because its failure was not willful.  It also asserts the ALC erred by awarding compensation to a party who was not a complainant.  It further contends the ALC ignored the exclusive remedy provision of the South Carolina Torts Claims Act (SCTCA).  We reverse.

**FACTS/PROCEDURAL HISTORY**

Ford Development Company (Ford) developed a subdivision, Belle Terre, on James Island.  The subdivision was adjacent to a tidal creek known as Parrot Creek.  DHEC's Office of Ocean and Coastal Resources Management (OCRM) approved a dock master plan (DMP) in March of 2002.  In July 2002, Ford applied to OCRM for a general permit for the construction of a dock for each of the twenty-seven waterfront lots in the subdivision.  The application depicted the dock for lot 9 (the Dock) as emanating straight from the property and was 556[1] feet long and was completely within lot 9's extended property lines.

On August 21, 2002, Richard J. Hook executed an agreement to purchase lot 10 in the subdivision for $1 million.   Lot 10 was adjacent to lot 9.

On January 21, 2003, OCRM issued the general permit authorizing the construction of the docks.[2]  In its approval of the permit, OCRM changed the trajectory of the Dock stating, the "dock will angle to Parrot Creek rather than extend straight from upland property thereby reducing the walkway length from 595 ' to 200'."  Ford did not file an appeal to any aspect of the permit, including changing the angle of the Dock.

The James Island Public Service District (the District) as well as several homeowners in a subdivision that was also adjacent to Parrot Creek filed an appeal of the permit issued.  Following a hearing, the District withdrew its appeal after reaching a settlement with Ford and DHEC.  On November 13, 2003, the ALC issued an order affirming the permits.  The homeowners appealed that order to the

---

[1] The record provides the length of the Dock as 556 feet in some places and as 595 feet at others.  The difference in the length has no bearing on this appeal.
[2] Each dock was given its own permit number.

South Carolina Coastal Zone Management Appellate Panel (CZMAP)[3] as to the docks on lots 12 through 23.[4]  The CZMAP affirmed the order on May 28, 2004.

Hook informed Ford he did not wish to purchase lot 10 unless the Dock was in the position Ford had originally submitted to OCRM, which was straight out instead of crossing in front of lot 10.  On August 13, 2004, Ford sought to modify the permit for the Dock because it asserted the Dock crossed the back lot line of lot 10 and obstructed the view of lot 10.  On December 13, 2004, OCRM denied Ford's request "to realign and extend the previously authorized dock."  OCRM stated "the currently permitted location was specifically authorized at the least damaging environmental alignment," which it asserted it was required to consider.  It provided it interpreted its regulation as indicating a shorter dock is better.  Also, it noted the current alignment of the Dock was within the approved dock corridor.  It indicated Ford's requested amendment was not consistent with its regulations because the amendment was not "in keeping with the spirit of the original [DMP]."  OCRM further noted that moving the Dock would not improve navigation.  OCRM stated it believed the only possible reason to move the Dock was "to move it away from lot 10" but that the use of the Dock would be identical in either position.  OCRM noted it is "to consider how the proposed use could affect the value and enjoyment a person (or persons) may derive with the property in this situation" but not "to consider perceived devaluation of property."  However, OCRM noted "this would be difficult to answer since the developer still retains ownership of the lot."

On January 5, 2005, Ford filed a contested case appealing OCRM's denial of Ford's application to amend the permit.  On January 12, 2005, Hook closed on the purchase of lot 10 from Ford.  According to Hook, he closed on the purchase only after being advised by Ford that it had reached a settlement with DHEC to amend the permit for the Dock.

Ford and OCRM resolved the issues between them, and Ford filed a motion for a consent order of dismissal with consent of DHEC.  The ALC filed a consent order (Consent Order) on February 9, 2005.  The Consent Order stated, "OCRM's reasons for denial included its staff's concerns related to the precedent of amendments to the General Permit, in light of the fact that the General Permit was

---

[3] "The review procedure under the Administrative Procedures Act was changed by 2006 South Carolina Laws Act No. 387, which eliminated the review of the AL[C]'s determination by the [CZMAP]." *Brownlee v. S.C. Dep't of Health & Env't Control*, 382 S.C. 129, 136 n.5, 676 S.E.2d 116, 120 n.5 (2009).

[4] These lots are not the subject of this appeal.

the subject of a protracted contested case appeal . . . ."  The Consent Order noted "the General Permit, the Final Order and Decision of the [ALC], and the Final Administrative Order of the [CZMAP] made no mention of OCRM's intent to limit amendments to the General Permit."

Their agreement between the parties was set forth as follows:

> 1.  OCRM authorizes amendment of [the permit for the Dock] . . . .  A drawing depicting this amendment request is attached . . . .
> 2.  Ford . . . agrees to adhere to the terms and conditions of the General Permit and to seek no further amendments to this Permit, with the exception of amendment requests seeking construction of handrails, boatlifts, or roofs at individual docks.
> 3.  OCRM agrees to accept applications for requests to amend docks permitted at Belle Terre in accordance with the General Permit, provided that those applications are limited to individual requests for the installation and construction of handrails, roofs, or boatlifts.  No other permit amendment requests will be accepted for processing by OCRM unless the applicant can demonstrate either 1) material and substantial changes to Parrot Creek or the Belle Terre property since the time of issuance of the General Permit or 2) consistency with the spirit and intent of the original General Permit.  The spirit and intent of the original General Permit was to reduce the potential for adverse cumulative impacts arising from the construction of 27 docks on Parrot Creek and any request that contravenes OCRM's efforts to reduce cumulative impacts will not be accepted or considered by OCRM.
> 4.  The parties understand that this agreement may not be considered binding on Ford's successors in title to lots at Belle Terre.  Therefore, Ford has executed a "First Amendment to Declaration of Covenants, Conditions and Restrictions for Belle Terre[]" . . . .  This First Amendment provides all subsequent lot purchasers notice of OCRM's intentions with regard to future permit amendments.

5.  The parties further agree that the terms and conditions of this Consent Order be incorporated, by reference, into the Special Conditions enumerated on the General Permit.

In the Consent Order, the ALC ordered:

1.  That [the permit for the Dock] be amended as indicated in the drawing attached . . . and[]
2.  That the General Permit issued to Ford . . . for construction of 27 docks at the waterfront development known as Belle Terre be amended through incorporation by reference of the terms and conditions of this Consent Order.

Through a string of transfers unrelated to this case, Jessica Patterson became owner of lot 9 and the permit for the Dock was transferred to her.  On July 25, 2012, Jessica gave her husband, Phillip Brent Patterson (Patterson), an ownership interest in the lot.

On August 29, 2014, Patterson submitted a request with OCRM to add a roof to the pierhead and a 12.5-foot-by-12.5-foot four-pile boat lift.  In the request, he listed Hook as one of his adjacent property owners and provided Hook's home address in Lexington.  According to DHEC, the request provided survey drawings depicting the Dock at the angled 200-foot trajectory shown in the January 31, 2003 DMP general permit.  On September 8, 2014, OCRM mailed a public notice of the permit amendment request to Hook at the Lexington address.  The notice stated: "Plans depicting the proposed work are available and will be provided upon receipt of written request or may be viewed on [DHEC's] website at: http://www.scdhec.gov/Apps/Environment/PublicNotices."  According to Hook, he has no recollection of receiving the notice.

In October of 2014, OCRM granted Patterson's request to amend the permit to authorize his requests[5] and issued a construction authorization on October 30.  Construction of the Dock began in November of 2014.  OCRM performed an inspection on December 30, 2014, stating it was an "As-Built drawing inspection."  The drawings showed the planned walkway of the Dock extending at an angle in

---

[5] DHEC asserts the project manager assigned to process the amendment request was not aware of the Consent Order.

front of lot 10, as originally shown in the permit approved by OCRM in 2003 and not the direction agreed to in the 2005 Consent Order. The construction was completed at the end of 2014.

In early 2017, Hook was inspecting his lot, which he had not developed since purchasing, and according to him, observed the Dock for the first time.

On March 17, 2017, Hook sent a letter to the ALC stating:

> On February 9, 2005, this [c]ourt issued an order . . . determining the location of a dock for Lot 9 in the subdivision. It appears that sometime after the date of the order, DHEC issued a dock permit for a dock in a location other than provided in the order. The dock was constructed in violation of the court's order. The illegal construction of the dock has destroyed my peaceful enjoyment of my lot. The original placement of the dock in the original Master Plan submitted for the Belle Terre Subdivision was straight out from Lot 9. The above referenced Court Order affirmed the dock for Lot 9 was to be kept in that location, which was straight out. The new location detracts from my property all of which happened without any notice to me. Upon discovering the issuance of a dock permit and construction of the dock, l am requesting this court to enforce its order and require DHEC to revoke the permit and require the removal of the dock which is in violation of the order of this court and reconstructed as ordered in the Court Order.

On March 30, 2017, Hook filed a request for a contested case hearing with the ALC.[6] On June 23, 2017, Hook filed a prehearing statement with the ALC, stating the "[n]ature of the proceeding" was a "[r]equest for the [ALC] to enforce the" Consent Order. It stated DHEC did not execute the Consent Order and as a result, the permit was issued and the Dock was constructed improperly.

---

[6] The request indicated Hook was not represented by an attorney.

On October 17, 2017, Hook filed an amended prehearing statement.[7]  The statement indicated Hook was seeking enforcement of the Consent Order and attorney's fees assessed against DHEC for its disregard of the Consent Order.  The statement also provided Hook would move for an order to enforce the Consent Order.  Hook argued DHEC was charged with knowledge of the Consent Order as a party to it.  Hook asserted:

> By its own terms, the [Consent] Order required replacement of drawings of the original permit with drawings that were attached to the Order.  The entire Consent Order, or at least the drawings, should have been appended to the permit in [DHEC's] permitting file immediately upon execution of the Consent Order by the parties.  This would have ensured that the correct drawings were transmitted to any third party who possessed the permit after 2005.

Hook's attorneys "concluded that the appropriate posture" for this case was "a Motion to Enforce the Consent Order" and suggested the case be transferred to the ALC judge who decided the 2003 permitting case and entered the 2005 Consent Order.[8]

On October 20, 2017, Hook filed a motion to enforce the Consent Order.  In it, Hook sought enforcement of the Consent Order and attorney's fees assessed against DHEC.  Hook argued:

> If the Consent Order is enforced, the permit issued to . . . Patterson must be voided and/or revoked.  The existing dock must be removed and replaced with a dock constructed in accordance with the Consent Order.  The financial responsibility for tearing down and replacing the dock at Lot 9 may rest with [DHEC] since [DHEC] was negligent in executing its duty to . . . Patterson and [Hook].  Additionally, [Hook] requests that this [c]ourt award attorney's fees to [him].

---

[7] After filing his request for a contested case hearing and first prehearing statement, Hook retained attorneys, who filed the amended statement.
[8] The case was not transferred.

On November 10, 2017, Patterson[9] filed a return to Hook's motion to enforce the Consent Order.  In it, he asserted that on June 14, 2014, he acquired from DHEC a copy of the permit for the Dock that showed the angled alignment with the 200-foot walkway.  Patterson argued Hook had provided no evidence the value of his lot was diminished by the Dock.  Patterson also questioned whether the Consent Order was valid or enforceable.  Patterson contended, "The parties to that Order were DHEC and Ford and related to the location of a dock that had already been subject to adjudication in a prior action to which Ford and DHEC had been parties."  Patterson therefore asserted, "*Res judicata* would appear to preclude Ford and DHEC from re-litigating the location of the docks."  Patterson also noted that collateral estoppel possibly barred Hook from enforcing the Consent Order.  Patterson further asserted Hook lacked standing to enforce the Consent Order because he was not party to it.

On November 13, 2017, DHEC filed a return to the motion to enforce the Consent Order.  DHEC stated the project manager who processed Patterson's 2014 request to amend his permit was unaware of the Consent Order.  It indicated "[n]ew internal office procedures have been put in place to prevent similar occurrences." DHEC requested the ALC allow the Dock to remain in place as constructed under Rule 60(b)(5), SCRCP.[10]  It contended Hook's "actions demonstrate[d] an inconsistent effort to protect his view corridor that is not even a prescriptive right under South Carolina law."  DHEC also asserted that to the extent the motion to enforce the Consent Order was actually a negligence claim against DHEC, the action belonged in the circuit court.

On November 17, 2017, Hook filed a reply to both DHEC's and Patterson's returns. In it, Hook asserted DHEC's Rule 60(b)(5) motion was filed too late to be included in the hearing scheduled for December 6, 2017, because SCALC Rule 19A required all motions be filed thirty days prior to the hearing date.  On the merits of the motion, Hook argued the Consent Order did not have prospective application and even if it did, equity did not support setting it aside.  Hook also maintained res judicata and collateral estoppel should not bar his action because they were not raised at the time of the Consent Order and the issue of the Dock being 595 feet was not litigated in 2003.  Hook contended Ford voluntarily changed the DMP,

---

[9] Patterson was represented by counsel at this time.

[10] Rule 60(b)(5), SCRCP, provides, "On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding . . . [if] it is no longer equitable that the judgment should have prospective application."

after it submitted it to DHEC for approval and while it was under review, to modify the placement and length of the Dock from 595 feet to 200 feet. Hook asserted the ALC's 2003 order found that OCRM modified the approved corridor for the Dock during the permitting process and this foreclosed litigation of the original longer length of the Dock during the 2003 contested case.

On November 30, 2017, DHEC filed a SCALC Rule 19A motion requesting its Rule 60(b)(5) motion be heard at the December 6 hearing for the purposes of judicial economy as that hearing concerned only Hook's motion because the final hearing had been continued and Hook had responded to DHEC's Rule 60(b)(5) motion.

On December 6, 2017, the ALC conducted a hearing on Hook's motion to enforce the Consent Order. No testimony was given during the hearing. At the beginning of the hearing, the ALC stated, "I think this is just a motions hearing today, we've decided." The ALC also stated:

> We're just here on the motion?
>
> It was your motion for -- to enforce the consent agreement and then later in November we had a motion filed by [DHEC], a 60([b])(5) motion; is that correct? And there's been some discussion about that, whether to include that today because it wasn't filed within the 30-day time frame and I know [Hook] has objected to considering that due to the fact that it was filed outside of the 30-day requirement.

The court ruled it would hear arguments on the Rule 60(b)(5) motion at the hearing but would also allow further submissions on it if the parties wished.

During arguments, Hook, when providing the background to the ALC, stated that when Hook learned of the Dock, he initiated with the court a contested case challenging Patterson's permit although he did not actually have an issue with the permit allowing the roof and four-pile boat lift but instead his issue was with the placement of the Dock. Hook argued an evidentiary hearing on the roof and boat lift was not needed because he was not challenging that but instead challenging DHEC's violation of the Consent Order. Hook also argued res judicata did not apply because the ALC did not rule in 2003 that the Dock could not be 595 feet long.

During DHEC's argument at the hearing, the ALC stated:

> The problem here is, sadly and unfortunately, when . . .
> Patterson was seeking to build his dock, he got the wrong
> schemata, the wrong plan. He got the old plan. The [sic]
> was this short corridor that cut across Lot 10, and it was a
> mistake. . . . [DHEC] made an error by providing the
> wrong information to . . . Patterson, who then acted on
> that. And then all information that went subsequent to
> that was wrong because it didn't -- it wasn't in accordance
> with the [C]onsent [O]rder, which was -- which created
> this 500-foot-long dock. So everything's wrong. It's all -
> - it starts off on the whole wrong foot and that's because
> an error, sadly and unfortunately, not -- nobody
> necessarily intended to do. But just a mistake made at
> [DHEC], and everything that went forward from there
> was based on this error. . . . [S]o then the notice goes
> out. But the notice is wrong because the notice doesn't
> give notice of what's really going on, which is that a
> totally different dock than the one that was -- everybody
> agreed upon is gonna be constructed. And . . . Hook has
> no reason to know that because the original mistake is so
> significant. But it's a mistake. Nobody knows that it's
> been made. It just -- starts everything off down the
> wrong path. I mean, literally you're going -- not just
> literally -- not just figuratively in the wrong direction but
> literally in the wrong direction. The dock's going the
> wrong way, and nobody knows that.

DHEC noted because Hook had stated in his pleadings DHEC was negligent, the
controversy was actually a tort and thus, under the SCTCA, Hook had to instead
bring an action in the circuit court.

Patterson presented the argument he had previously submitted to the ALC in
writing but also noted:

> I don't know that you have to go to such economic waste
> and destruction if what [Hook's] really saying is I don't
> have the value of my investment. Then what he's really

looking for is money damages. He wants the difference between what he paid for his property versus what it's worth now. And the way -- I assume -- I've done this before in other cases where you try and prove damages by something DHEC's doing. You get an appraiser. Here['s] the property as it is; here's the property if they do this. Give me some comparables. What's it worth now as it is? What's it like if these people next door do that? And that's your measures of damages.

Going out and tearing up docks that have been there, I mean, I understand she says, well, 500-foot-long docks are common in this area. Sure, they are. But there's a difference between having a dock corridor that shows that you can build a 500-foot-long dock and actually already having at that dock there and having to tear it down. So what Hook is entitled to, again, if he's entitled to anything, would be some way where [he] can demonstrate the diminution -- in fact, I don't know if this property has even gone back up to where it was worth when he bought it, based on just the market situation. Although clearly everybody's aware that the market generally, and in Charleston County in particular[], it is back on the rise.

. . . .

. . . But that, to me, if I would advise him would be the direction he would go, and I just think the draconian response of having DHEC come in and rip out an existing usable dock because, despite what he says, it's clearly aesthetic value.

In reply, Hook argued:

You enforce [the Consent Order] by requiring OCRM to adhere to its agreed-to term in the order that it would amend its permit with the [C]onsent [O]rder. It needs to amend the general permit in accordance with the [C]onsent [O]rder. Had it done that properly, you know,

in its records, we wouldn't be here today. And once that is accomplished via through your order, then the dock as it exists, is inconsistent with this [C]onsent [O]rder, and administrative action has to be taken to have the dock made consistent with the [C]onsent [O]rder. So the relief that we're asking for can be accomplished.

At the conclusion of the hearing, the ALC asked the parties if they needed to present anything else and stated they would have ten more days if they wished to submit anything additional to the court regarding DHEC's Rule 60(b)(5) motion.

On August 22, 2018, the ALC initiated a conference call to the parties.[11] Following the call, the parties filed briefs in response.

DHEC's brief argued the ALC did not have the authority to order DHEC to reimburse Patterson for the cost of materials and construction of the Dock. DHEC argued because Hook had asserted in his motion to enforce the Consent Order that DHEC was negligent in exercising its duty to Patterson, any responsibility for those costs would have to be recovered under the SCTCA, which allows for adjudication of those claims in only the circuit court. Additionally, DHEC argued any award of attorney's fees would be erroneous because section 15-77-300 of the South Carolina Code (2005 & Supp. 2022) applies to only civil actions, which a contested case before the ALC is not.

Patterson's brief stated that at the ALC's request, he was providing the costs for building the Dock, which totaled $46,936, and also for an estimate of the cost to demolish and remove the Dock, which was $67,970. He provided the total costs to install the Dock and the costs to remove the Dock. He stated he was responding to the ALC's request for guidance on if it could award him attorney's fees because he had not requested them in his return to the motion to enforce. Patterson asserted that because he had only filed a return thus far, he had not yet filed a pleading that allowed him to assert a request for attorney's fees, such as a prehearing statement for a contested case. Patterson indicated his legal fees at that point amounted to $9,363.90.

Hook filed a response brief indicating he believed the ALC had concluded in the telephone conference that an award of attorney's fees from DHEC to Hook was

---

[11] The record does not contain a transcript of the call because no court reporter was present.

appropriate. Hook asserted an award was appropriate under section 15-77-300 and SCALC Rule 72. Hook stated "the DHEC staff overlooked or misplaced the Consent Order and acted in complete disregard of the Consent Order." Hook asserted he had incurred fees of $29,226.19.

On May 3, 2019, the ALC issued an order granting Hook's motion to enforce the Consent Order and denying DHEC's Rule 60(b)(5) motion. The ALC noted Hook had asserted DHEC was in contempt of the Consent Order. The ALC determined that because DHEC entered into the Consent Order, it was aware of the Consent Order. The ALC found the record contained "no evidence of any legitimate effort by [DHEC] to comply," as well as "no justifiable explanation for its failure to comply" since the Consent Order had been issued. The ALC stated, "While [DHEC] appears to place blame squarely on its Project Manager, it was [DHEC's] failure to act for nearly ten years that culminated in the Project Manager's purported negligent or inadvertent actions." The ALC noted that "even after this failure was specifically brought to [DHEC's] attention by way of [Hook's] [m]otion, [DHEC] failed to take any steps to remedy the noncompliance." The ALC determined "[DHEC's] failure to comply, despite having the power to do so, rises to the level of contempt." The ALC ordered DHEC to comply with the Consent Order and take any remedial action necessary, such as removing the noncompliant dock, at DHEC's expense. It also ordered DHEC to pay Hook's attorney fees of $29,226.19 and Patterson's attorney's fees of $9,363.90. It further ordered DHEC to pay Patterson $46,936 for the construction costs of the noncompliant dock.

Patterson filed a motion to alter or amend,[12] arguing the property owners involved in the 2003 case that contested the dock permits at that time did not receive any notice of the 2005 contested case that led to the Consent Order that changed the alignment of the Dock. He asserted those property owners "were excluded from any chance to plead [r]es [j]udicata and [c]ollateral [e]stoppel[,] which should have been their right" and therefore, it should be allowed to be pled here.

DHEC filed a motion to reconsider, arguing its actions did not rise to the level of willful disobedience of a court order and it was deprived of due process. Further, it asserted even if its actions amounted to willful disobedience, a compensatory contempt award to Patterson was improper because he was not the complainant. Additionally, it asserted the SCTCA was the exclusive remedy.

---

[12] Patterson filed the motion pro se because he was no longer represented by counsel.

DHEC later filed a return to Patterson's motion to reconsider and a supplement to its motion to reconsider. DHEC agreed with Patterson "that the convoluted history of this case from 2004 to present, raise[d ]the potential of a 'miscarriage of justice' unless the parties to the 2003 litigation . . . [we]re given an opportunity to be heard." It asserted the property owners that were parties in the 2003 case "were parties to a fully-litigated, contested case that resulted in an order in which they, or their successors in interest, have rights that are potentially harmed by the [Consent] Order and" the current order. DHEC indicated that whether those parties had notice of the 2005 proceedings and resulting Consent Order was unclear. DHEC also asserted "the parties with interests that may [have been] impacted by the 2019 [o]rder ha[d] not been notified of the current proceedings." It stated that those "parties' interests [could not] be adequately represented by the existing parties to this litigation." It asserted that those parties should be joined under Rule 19(a), SCRCP.

Hook filed a return to DHEC's motion to reconsider. He argued the evidence established the situation here arose due to clear failures of DHEC to "append the Consent Order to the permit in []DHEC's own permitting file, whether in paper or electronic form, and have procedures "to ensure that its own permitting staff was . . . aware of an agreement that [DHEC] had negotiated, signed[,] and filed with the [ALC] and [that] directly affected a permit issued by" DHEC. He noted DHEC provided that procedures had been put into place but that was after this case arose. He asserted DHEC "offered no evidence of any effort undertaken to comply with [the] Consent Order," as DHEC "could not confirm that the Consent Order was ever placed in the permitting file for the subject permit, either at the time it was entered or at any point during the thirteen-year period that transpired before this case." Hook argued DHEC "gave no explanation as to why the Consent Order was not available when . . . Patterson applied for his amendment and built his dock in 2014." Further, Hook asserted that by DHEC's account, the permitting file lacked any documentation of Ford's "request to amend the subject permit and of the 2005 contested case filing [that] led to the negotiation of the Consent Order." He contended "[t]hese documents should have been accessible to the Project Manager assigned to . . . Patterson's amendment request."

The ALC issued an amended order granting Hook's motion to enforce the Consent Order and denying DHEC's Rule 60(b)(b) motion. The amended order largely reiterated the May 3, 2019 order, which it vacated and replaced. The ALC found DHEC's and Patterson's arguments about giving the parties to the 2003 litigation an

opportunity to be heard and be joined were being raised for the first time in motions to reconsider and therefore would not be considered.

As "to the remedy that can be granted when enforcing the Consent Order," the ALC noted "[Hook] asserts that [DHEC] is in contempt of the Consent Order."

> In this case, [DHEC] does not dispute that it entered into the Consent Order in February 2005, or that it was aware of its specific obligations thereunder.  [DHEC] also does not dispute that it, as the [s]tate agency charged with administering dock permits, had the duty and the power to comply with the Consent Order.  However, there is no evidence of any legitimate effort by [DHEC] to comply with the Consent Order, and no justifiable explanation for its inability to comply after its issuance in 2005.  In fact, [DHEC] failed to even allege a good-faith effort to comply with the Consent Order from which it now seeks relief.  While [DHEC] appears to place blame solely on its Project Manager, it was [DHEC]'s failure to amend the Permit in accordance with the Consent Order in the nearly ten years after its issuance that culminated in the Project Manager's purported inadvertent actions.  Moreover, even after this failure was specifically brought to [DHEC]'s attention by way of [Hook's] [m]otion, [DHEC] failed to take any steps to remedy its noncompliance.

> In light of the foregoing, the court finds that [DHEC's] failure to comply with the Consent Order, despite having the power and ample ability to do so, rises to the level of contempt. . . .  While the court does not take this position lightly, there is simply no evidence of any effort by [DHEC] to comply with or remedy its noncompliance.  It would be unjust to allow [DHEC] to ignore its obligations under the Consent Order to the detriment of others without repercussion, while reaping the benefits conferred by it for well over a decade.  The court further finds that such a conclusion best serves the interests of equity and judicial economy as well.

The ALC ordered DHEC to

> comply with the Consent Order and, at its own expense,
> take such remedial measures as are necessary to
> effectuate the Consent Order.  Such compliance may be
> accomplished by retroactively amending the Permit,
> reflecting the Amended Alignment with a postdated
> expiration date, and bringing an enforcement action
> against Patterson for the removal of the existing
> noncompliant dock.  Additionally, the court finds that
> [Hook] has suffered actual losses due to the legal fees he
> incurred enforcing the Consent Order, and that Patterson
> has suffered actual losses by building a noncompliant
> dock in reliance on the version of the Permit issued to
> him by [DHEC], as well as by incurring legal fees
> defending this action.  Thus, [DHEC] must pay legal fees
> to [Hook] in the amount of $29,226.19.  Likewise, upon
> removal of the noncompliant dock at its expense,
> [DHEC] must pay a fine in the amount of $56,299.90, to
> Patterson for the original cost of his noncompliant dock
> and his legal fees.

(footnote omitted).

This appeal by DHEC followed.

**STANDARD OF REVIEW**

"The Administrative Procedures Act (APA) establishes the standard of review for appeals from the ALC." *Abel v. S.C. Dep't of Health & Env't Control*, 419 S.C. 434, 437, 798 S.E.2d 445, 446-47 (Ct. App. 2017) (quoting *Greeneagle, Inc. v. S.C. Dep't of Health & Env't Control*, 399 S.C. 91, 95, 730 S.E.2d 869, 871 (Ct. App. 2012)).  "Under the APA, this court may 'reverse or modify the decision [of the ALC] if the substantive rights of the petitioner have been prejudiced because the finding, conclusion, or decision is . . . (d) affected by other error of law.'" *Id.* at 437, 798 S.E.2d at 447 (alterations by court) (quoting S.C. Code Ann. § 1-23-610(B) (2005)).

"A determination of contempt ordinarily resides in the sound discretion of the trial judge." *Cheap-O's Truck Stop, Inc. v. Cloyd*, 350 S.C. 596, 607, 567 S.E.2d 514, 519 (Ct. App. 2002) (quoting *State v. Bevilacqua*, 316 S.C. 122, 129, 447 S.E.2d 213, 217 (Ct. App. 1994)). "On appeal, a decision regarding contempt should be reversed only if it is without evidentiary support or the trial judge has abused his discretion." *Stone v. Reddix-Smalls*, 295 S.C. 514, 516, 369 S.E.2d 840, 840 (1988).

**LAW/ANALYSIS**

DHEC contends the ALC erred in finding DHEC's actions amounted to willful disobedience of a court order. It asserts the record does not contain any "clear and specific" acts or conduct by it that supports the ALC's finding of willful failure to comply with the Consent Order. It furthers maintains the ALC failed to provide sufficiently-detailed factual findings of DHEC's willful disobedience of the Consent Order "to enable the reviewing court to determine whether the findings are supported by the evidence and whether the law has been applied to those findings." Additionally, it argues section 1-23-600(H)(2) of the South Carolina Code (Supp. 2022), the automatic stay provision, prevented DHEC from complying with the Consent Order before the ALC issued a decision in this matter. Further, it contends in light of the competing interests under the 2003 and the 2005 orders, DHEC acted lawfully and without willful disobedience until the competing rights are resolved. We agree.[13]

"The APA provisions permit parties to resolve disputes through informal stipulations." *Leventis v. S.C. Dep't of Health & Env't Control*, 340 S.C. 118, 133, 530 S.E.2d 643, 651 (Ct. App. 2000) (citing S.C. Code Ann. § 1-23-320(f) (1986) ("Unless precluded by law, informal disposition may be made of any contested case by stipulation, agreed settlement, consent order or default.")).

"[A] consent order is an agreement of the parties, *under the sanction of the court*, and is to be interpreted as an agreement." *Johnson v. Johnson*, 310 S.C. 44, 46,

---

[13] Patterson did not file a notice of appeal. He filed a Respondent's brief, in which he argues the ALC's order should be reversed for several reasons. Because Patterson did not file a notice of appeal, his arguments in his brief supporting reversal are not properly before this court. *See Com. Credit Loans, Inc. v. Riddle*, 334 S.C. 176, 187, 512 S.E.2d 123, 129 (Ct. App. 1999) (finding the court did not need to address an issue raised by respondent as a ground for error in its respondent's brief when the respondent did not file an appeal).

425 S.E.2d 46, 48 (Ct. App. 1992) (emphasis added). "In South Carolina jurisprudence, settlement agreements are viewed as contracts." *Abel v. S.C. Dep't of Health & Env't Control*, 419 S.C. 434, 438, 798 S.E.2d 445, 447 (Ct. App. 2017) (quoting *Nichols Holding, LLC v. Divine Cap. Grp.*, 416 S.C. 327, 335, 785 S.E.2d 613, 615 (Ct. App. 2016)); *see also City of North Myrtle Beach v. E. Cherry Grove Realty Co.*, 397 S.C. 497, 503, 725 S.E.2d 676, 679 (2012) ("As a general rule, judgments are to be construed like other written instruments." (quoting *Weil v. Weil*, 299 S.C. 84, 90, 382 S.E.2d 471, 474 (Ct. App. 1989))). "The court's duty is to enforce the contract made by the parties regardless of its wisdom or folly, apparent unreasonableness, or the parties' failure to guard their rights carefully." *Abel*, 419 S.C. at 438, 798 S.E.2d at 447 (quoting *Nichols Holding, LLC*, 416 S.C. at 335, 785 S.E.2d at 615).

"Courts have no more important function to perform in the administration of justice than to ensure their orders are obeyed. The appellate courts of this state have zealously defended the right of trial courts to vindicate their authority by way of contempt." *State v. Bevilacqua*, 316 S.C. 122, 128, 447 S.E.2d 213, 216 (Ct. App. 1994). "Absent the issuance of an order staying its effect, any violation of the terms and provisions of a final order and decision of an administrative law judge may subject the violator to sanctions for contempt and/or a fine." Marvin F. "Buddy" Kittrell, *How to Obtain a Stay of an ALJ'S Final Decision*, S.C. Envtl. Compliance Update, Aug. 1998, at 1.

"All courts have the inherent power to punish for contempt, which 'is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts, and consequently to the due administration of justice.'" *Ex parte Cannon*, 385 S.C. 643, 660, 685 S.E.2d 814, 824 (Ct. App. 2009) (quoting *Miller v. Miller*, 375 S.C. 443, 453, 652 S.E.2d 754, 759 (Ct. App. 2007)). "Nevertheless, contempt is an extreme measure and the power to adjudge a person in contempt is not to be lightly asserted." *Bevilacqua*, 316 S.C. at 128, 447 S.E.2d at 216. "Even though a party is found to have violated a court order, the question of whether or not to impose sanctions remains a matter for the court's discretion." *Hawkins v. Mullins*, 359 S.C. 497, 503, 597 S.E.2d 897, 900 (Ct. App. 2004).

"Generally, [section] 1-23-630 [of the South Carolina Code (Supp. 2005)] grants Administrative Law Judges the same power in chambers or in an open hearing as circuit court judges, along with the power to issue those remedial writs as are necessary to give effect to its jurisdiction." *S.C. Dep't of Revenue v. Club Rio, Inc.*, No. 06-ALJ-17-0647-IJ, 2006 WL 2617194, at *2 (S.C. Admin. Law Ct. Aug. 22,

2006). "The power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice." *Id.* (quoting *Ex Parte Robinson*, 86 U.S. 505, 510 (1873)); *see also* 73A C.J.S. *Public Administrative Law and Procedure* § 595 (2014) ("Disobedience of a decree or order enforcing an administrative decision or order is punishable by contempt proceedings, and whether a party has failed to comply with the provisions of an enforcement decree or order is to be determined by the court in contempt proceedings." (footnote omitted)); 17 C.J.S. *Contempt* § 50 (2020) ("Governmental entities and their agents are subject to civil contempt for failure to comply with court orders and judicial decrees.").

"In an action for contempt, the burden of proof is on the moving party." *Brasington v. Shannon*, 288 S.C. 183, 184, 341 S.E.2d 130, 131 (1986). "A party seeking a contempt finding for violation of a court order must show the order's existence and facts establishing the other party did not comply with the order." *Noojin v. Noojin*, 417 S.C. 300, 306, 789 S.E.2d 769, 772 (Ct. App. 2016) (quoting *Abate v. Abate*, 377 S.C. 548, 553, 660 S.E.2d 515, 518 (Ct. App. 2008)). "In a proceeding for contempt for violation of a court order, the moving party must show the existence of a court order and the facts establishing the respondent's noncompliance with the order." *Hawkins*, 359 S.C. at 501, 597 S.E.2d at 899. "Once the movant makes a prima facie showing by pleading an order and demonstrating noncompliance, 'the burden shifts to the respondent to establish his defense and inability to comply.'" *Eaddy v. Oliver*, 345 S.C. 39, 42, 545 S.E.2d 830, 832 (Ct. App. 2001) (quoting *Henderson v. Henderson*, 298 S.C. 190, 197, 379 S.E.2d 125, 129 (1989)).

"[B]efore a court may find a person in contempt, the record must clearly and specifically reflect the contemptuous conduct." *Widman v. Widman,* 348 S.C. 97, 119, 557 S.E.2d 693, 705 (Ct. App. 2001). "A finding of contempt . . . must be reflected in a record that is 'clear and specific as to the acts or conduct upon which such finding is based.'" *Tirado v. Tirado*, 339 S.C. 649, 654, 530 S.E.2d 128, 131 (Ct. App. 2000) (quoting *Curlee v. Howle*, 277 S.C. 377, 382, 287 S.E.2d 915, 918 (1982)). "[C]ontempt results from willful disobedience of a court order; . . . before a person may be held in contempt, the record must be clear and specific as to acts or conduct upon which the contempt is based." *Cheap-O's Truck Stop, Inc. v. Cloyd*, 350 S.C. 596, 607, 567 S.E.2d 514, 519 (Ct. App. 2002) (quoting *Bevilacqua*, 316 S.C. at 129, 447 S.E.2d at 217). "A willful act is . . . one done voluntarily and intentionally with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be

done; that is to say with bad purpose either to disobey or disregard the law." *Id.* at 607-08, 567 S.E.2d at 520 (quoting *Bevilacqua*, 316 S.C. at 129, 447 S.E.2d at 217).

In the case of *Ex parte Kent*, 379 S.C. 633, 666 S.E.2d 921 (Ct. App. 2008), this court reversed a decision by the trial court to hold an expert witness in contempt. The trial court held the witness in contempt "on the basis that [the witness] deliberately gave inadmissible testimony . . . .  In issuing contempt sanctions, the trial court reasoned that [the witness] had substantial and continuous involvement in court proceedings as an expert witness over a number of years and should have known that evidence regarding a citation was inadmissible." *Id.* at 637, 666 S.E.2d at 923.  However, this court noted "the colloquy during the trial indicates the trial court made no inquiry to determine [the witness's] knowledge regarding the admissibility or inadmissibility of a citation." *Id.*

This court although "mindful of the trial court's concern and recogniz[ing] the possibility of such knowledge of inadmissible evidence by an individual who regularly appears in court," found "the extent of such knowledge for the purposes of determining willfulness must be sufficiently established by the record prior to an imposition of a contempt sanction." *Id.* at 639, 666 S.E.2d at 924.  This court determined, "The extent of [the witness's] knowledge was not established in the record and may not be established by speculation." *Id.*  This court found it was required to "confine [its] review to the record presented" and held "the trial court's decision to impose contempt sanctions upon [the witness] lack[ed] evidentiary support." *Id.*  Accordingly, this court "reverse[d] the sanction."[14]  *Id.*

"[C]ivil contempt must be proven by clear and convincing evidence . . . ." *Ex parte Cannon*, 385 S.C. at 661, 685 S.E.2d at 824.  "'The purpose of civil contempt is to coerce the defendant to do the thing required by the order for the benefit of the complainant[,]' while '[t]he primary purposes of criminal contempt are to preserve the court's authority and to punish for disobedience of its orders.'" *Id.* at 662, 685 S.E.2d at 824 (alterations by court) (quoting *Poston v. Poston*, 331 S.C. 106, 111,

---

[14] However, Judge Thomas concurred in part and dissented in part; she believed the record supported a finding of willfulness and the contempt should be affirmed because "the courtroom experience [the witness] presented while being qualified as an expert witness" demonstrated the witness "knew a traffic citation is inadmissible in a court of law." *Ex parte Kent*, 379 S.C. at 641-44, 666 S.E.2d at 925-27 (Thomas, J., concurring in part and dissenting in part).

502 S.E.2d 86, 88 (1998)).  "If it is for civil contempt, the punishment is remedial and for the benefit of the complainant."  *Id.*

Although DHEC violated the Consent Order by issuing the permit showing the Dock in the wrong position, the record contains no evidence that the permit was issued with any intent to violate the law.  Hook speculates that a DHEC employee failed to follow practices by not entering the Consent Order into its records as a modification of the original permit.  However, no evidence demonstrates what actually happened.  To uphold a finding of contempt, the record must contain evidence that some DHEC employee acted purposefully in disregarding the Consent Order.  *See Spartanburg Cnty. Dep't of Soc. Servs. v. Padgett*, 296 S.C. 79, 82-83, 370 S.E.2d 872, 874 (1988) ("A willful act is . . . one 'done voluntarily and intentionally with the specific intent to do something the law forbids, or with the specific intent to fail to do something the law requires to be done; that is to say, with bad purpose either to disobey or disregard the law.'" (quoting *Black's Law Dictionary* 1434 (5th ed. 1979))).  Here, the record contains no actual acts of willfulness.[15]  Hook stated "the DHEC staff overlooked or misplaced the Consent Order."

---

[15] Hook points to, as did the ALC, DHEC's failure take any action once the issue was brought to DHEC's attention by Hook.  Hook notes DHEC provided it had put in place procedures to ensure this does not happen in the future, but he asserts DHEC needed to also take affirmative action for the current situation.  The automatic stay provision, which DHEC asserts prevented it from taking any action to comply with the Consent Order once the order was brought to its attention by Hook until the ALC decided the matter, provides: "A request for a contested case hearing for an agency order stays the order.  A request for a contested case hearing for an order to revoke or suspend a license stays the revocation or suspension."  S.C. Code Ann. § 1-23-600(H)(2).  Under subsection (H)(4)(a) "a party may move before the presiding [ALC] to lift the stay imposed pursuant to this subsection or for a determination of the applicability of the automatic stay."  § 1-23-600(H)(4)(a) (Supp. 2022) (amended by Act No. 134, 2018 S.C. Acts 1313, § 1, effective Mar. 12, 2018 (limiting the amount of time an automatic stay could last)); *see also* Michael Traynham, *Opening the Flood Gates? Preservation Society and "Affected Person" Standing*, S.C. Law., Nov. 2020, at 40, 44 ("Act 134 was passed, amending the prior law governing automatic stays of DHEC permitting decisions during the pendency of a contested case hearing.  The new law shifted the burden of maintaining the status quo to the party challenging the decision.").  "The purpose of the automatic stay is to preserve the status quo until a decision is rendered in a contested case . . . ."  *Tract 7, LLC v. S.C. Dep't of Health & Env't*

Hook asserts because DHEC should be charged with knowing it agreed to the Consent Order, any violation of that order should be found to be willful. We cannot agree with this position in a contempt matter because willfulness is a crucial element. Hook does not provide us, nor could we find, any South Carolina case providing that an entire agency is charged with knowledge of an employee's actions for purposes of willfulness in a contempt finding as he asserts. Therefore, the ALC erred in finding DHEC's behavior was willful and thus holding it in contempt. Because the attorney's fees and costs awarded to Hook and Patterson are predicated on the finding of contempt, the attorney's fees and costs are also reversed.[16] *See Spartanburg Buddhist Ctr. of S.C. v. Ork*, 417 S.C. 601, 610, 790 S.E.2d 430, 435 (Ct. App. 2016) (determining because it decided "to reverse the circuit court's findings on contempt, [it] also reverse[d] the award of attorney's fees"); *Eaddy*, 345 S.C. at 44, 545 S.E.2d at 833 (reversing the issue of attorney's fees when the appellate court reversed the lower court's finding on contempt).

**REVERSED.**

---

*Control*, No. 15-ALJ-07-0258-CC (S.C. Admin. Law Ct. July 13, 2015) (citing *Graham v. Graham*, 301 S.C. 128, 130, 390 S.E.2d 469, 470 (Ct. App. 1990)); *Santee Cooper Resort, Inc. v. S.C. Pub. Serv. Comm'n*, 298 S.C. 179, 184, 379 S.E.2d 119, 122 (1989) ("[A] 'stay' is a 'stopping.'" (quoting *Black's Law Dictionary* 1267 (5th ed. 1979))). Once DHEC was made aware by Hook's letter the permit showed the Dock in the incorrect position, the damage was already done. DHEC correctly waited to take any action such as revoking Patterson's permit until the ALC reached a decision on the matter. Further, because Hook started this case by filing a contested case hearing, DHEC was not wrong to rely on the automatic stay provision.

[16] Based on this determination, we need not consider DHEC's remaining arguments that ALC erred in (1) ignoring the competing interests of parties to the 2003 and the 2005 orders; (2) depriving it of due process as to the compensatory contempt award; (3) awarding compensatory contempt damages to Patterson because a compensatory contempt award is limited to the complainant's expenses only and Patterson was not a complainant; and (4) ignoring the SCTCA's "exclusive remedy" provision under section 15-78-200 of the South Carolina Code (2005). *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (providing an appellate court need not review the remaining issues when its determination of a prior issue is dispositive of the appeal).

**WILLIAMS, C.J., and VINSON, J., concur.**